[No. 42352. En Banc. December 16, 1974.]

NORTHSHORE SCHOOL DISTRICT NO. 417 *et al., Petitioners,* v. GEORGE KINNEAR *et al., Respondents.*

686

*James J. Caplinger, Carroll, Rindal, Caplinger & Kennedy, John Gant, David J. Williams, Colvin & Williams, George Akers, Montgomery, Purdue, Blankinship & Austin,* and *William Andersen,* for petitioners.

*Slade Gorton, Attorney General,* and *Richard M. Montecucco* and *William A. Coats, Assistants,* for respondents.

HALE, C.J.—Education is a bulwark of this democracy. A system of free public schools, like a system of open courts, not only helps make life worth living but sustains our long-cherished ideas of individual liberty. Where the nation's constitution provides for a system of open courts, however, it makes no mention of free public schools. The people of this state found this oversight unacceptable

in 1889 when they brought Washington Territory into the Union. Not only did they establish a judicial system, but at the same time they provided for a system of free public schools, imposing then and there a duty upon the State to make ample provision for the education of all children within its borders.

Since statehood, the legislature has structured a comprehensive system of public schools, enacting, reenacting, amending and repealing a detailed code for the funding, operating and maintaining of that system which includes a code for the employment, certification, and retirement of teachers and school administrators. It is a system administered by a Superintendent of Public Instruction and a State Board of Education but puts direct responsibility and authority for actually operating the schools upon 320 separate school districts. The constitutionality of that system is now challenged.

Petitioners are 25 of the 320 school districts of this state, their directors, resident parents, taxpayers and children. They bring their original petition to this court for a writ of prohibition and mandamus to declare the State's system for funding its public schools unconstitutional and to prohibit State officers from collecting and disbursing public funds in support of it.[1] So sweeping are the demands that, if their

---

[1]"WHEREFORE, Petitioners respectfully petition this Court as follows:

"A. That defendant-respondents, and each of them, be directed to reallocate the funds available for financial support of the school system, including, without limitation, funds derived from the taxation of real property, and to otherwise restructure the financing scheme in such a manner as not to violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the Constitution of the State of Washington.

"B. That defendant-respondents be prohibited from allocating the funds available for financial support of the school system, including funds derived from the taxation of real property, to be allocated and in such a manner as to violate the Constitution of the State of Washington and the Equal Protection Clause of the United States Constitution.

"C. That the Court declare that the financing scheme is void and without force or effect as repugnant to the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States and repugnant to the Constitution of the State of Washington."

petition were upheld, the schools would have to be closed unless the legislature redesigned and restructured the statutes for the funding and operation of the public school system in consonance with the requirements of the decisional law which would be laid down by this court in sustaining the petition. For reasons now stated, we sustain the constitutionality of the laws creating, funding and maintaining the public schools and deny the petition.

Petitioners advance four arguments for unconstitutionality:

1. That the children of this state are denied equal protection of the laws in violation of the fourteenth amendment to the Constitution of the United States, and article 1, section 12 of the Constitution of the State of Washington because of the differences in assessed valuation per pupil of property within the several districts.

2. That taxpayers in districts with lower assessed valuation per pupil are denied equal protection of the law in violation of the fourteenth amendment to the United States Constitution and article 1, section 12 of the Constitution of the State of Washington because the low assessed valuation compels them to pay a higher percentage of taxes to raise the same amount of money for the schools than do taxpayers in the high assessed valuation districts.

3. That the State system fails to make ample provision for the education of all children in the state of Washington as prescribed by Const. art. 9, § 1.

4. That the State has failed to provide a general and uniform system of public schools as prescribed by Const. art. 9, § 2.

It should be noted that all of the four contentions are directed not only to the entire present system of funding the public schools but they necessarily challenge the entire statutory code establishing the several districts and operating and maintaining the common schools of the state. The system for funding is merely the obverse side of the system for collecting and distributing the money and the two are

so inextricably connected that the constitutionality of the one cannot be appraised without considering the other. For this reason, it is clear petitioners must, in order to challenge the funding system, include the spending system, for funding necessarily includes disbursements. Thus, the remedy sought must be deemed to include a prohibition of collecting and disbursement of moneys for the operation of the presently existing system of public schools. Petitioners' challenge is thus sweeping, comprehensive and all-encompassing. It is not directed to any particular section or sections of the education code of this state but to the entire code embodied in RCW 28A.

More specifically, petitioners ask this court to issue writs of mandate and prohibition directing that State school moneys be allocated among the school districts on a different basis than now prevails; that the court direct that a new and different scheme or system for school financing be established; that respondent public officers be prohibited from allocating and distributing State school moneys to the various districts in the assertedly unconstitutional way it is now done; and that this court declare the present system and method of school financing and funding unconstitutional and, therefore, void. This court can and should, it is claimed, even if it grants the relief asked, retain jurisdiction of this case to afford the respondent public officials and the legislature reasonable time in which to provide a system of school funding and financing which will comply with the constitutions. What will happen to the schools of this state should the legislature fail to meet these requirements is left to the imagination.

Respondents are various State officers whose official responsibilities, in one way or another, affect the operation of the public schools of this state. They include the Superintendent of Public Instruction, the Director of the Department of Revenue, the State Treasurer, and the Members of the State Board of Education. The true respondent, of course, but not named as a party, is the State legislature

upon whom the main responsibility for funding the schools inevitably falls and through whose enactments the whole school system now under challenge was created and is now maintained.

Because this was an original application for prohibition and mandamus and the parties could reach no agreement on the facts, this court referred the matter to the Superior Court which heard evidence and entered findings of fact. The evidence presented to the Superior Court consisted almost entirely of statistical data released principally by the Office of the Superintendent of Public Instruction, with some from the various school district offices, and the opinion evidence of experts explaining or interpreting the statistical data. The statement of facts thus is in the form of many tables, graphs, charts, diagrams, lists and numerical records, and the testimony of professional experts in school affairs interpreting, interpolating and explaining them. Thus, the court's findings from the very nature of the evidence are largely matters of opinion, and this court is in an equally good position with the Superior Court to examine the whole record for a determination of those facts ultimately affecting the constitutionality of the State system of public schools.

Our responsibility in this case, as a court passing upon the constitutionality of the common school system of the state, its funding, financing and operations, is to stick to the issues and if possible avoid editorializing about the plight of the schools and their needs, and we take it we should stifle the tendency normally arising in a case of this sort to convey to the legislature and the board and the Superintendent of Public Instruction our view as to how the schools should be maintained and the kinds of taxes which should be imposed and the ways the revenues should be distributed to maintain them. We are concerned here with the issues of constitutionality and nothing else arising from a challenge to the statutory structure of the common school system of the state, a system embodied in a comprehensive

code of education (RCW 28A) and an administrative code (WAC 180) implementing it.

Petitioners' contentions that they, as parents, children and school districts, are deprived of equal protection of the laws, are based largely on the assertion that comparative property values, being unequal among the 320 districts, inevitably reflect a disparity in the quality of educational opportunities among the districts. Districts having a higher assessed valuation per pupil, they say, have an easier time passing special school levies; since special school levies mean added revenue derived from added millage, the greater the appraised value, the more revenue from the same millage, and thus an even greater disparity, producing finally, it is argued, an inequality rising to unconstitutional proportions as the *percentage* of State funds declines with the increasing percentage of local funding. Thus, it is argued that the ratio of State contributions compared to local contributions renders the existing scheme unconstitutional. Expressed otherwise, as the local funding increases, largely through special levies in relation to State funds, the State's percentage inevitably decreases.

Before considering the factual data put into the record and the expert opinion concerning its meaning, there are a few basic concepts and facts of school funding upon which there is little or no disagreement. Article 9, section 2, of the State constitution does impose upon the State a duty to make available to every child within its borders the means for an ample education. The State now tries to do this by means of the State Superintendent of Public Instruction, a State Board of Education, and the establishment of 320 school districts having locally elected and designated boards and administrators. The statutory code for operating the entire school system is principally contained in RCW 28A, various tax statutes, an administrative code, and statutes providing for the funding and operation of a teacher retirement system (RCW 41.32). The existing statutory structure funding and operating the whole scheme began with statehood and ever since has been under continuing

development and evolution by means of statutory enactments. Resort to the legisative history will show that in the past 50 years the legislature has rarely failed to make important amendments and changes in the statutory structure for funding and operating the common schools.

Under the existing statutory scheme, the two main sources of school money are funds from local property taxes and State funds contributed directly to all districts, guaranteeing a fixed amount per pupil to each district. Other sources come from "in lieu of tax receipts, real estate excises, state forest funds" and other minor sources of revenue. These latter do not materially affect the question of constitutionality for the issue here is the amount of State funds in relation to local property tax funds.

To achieve what the State Superintendent of Public Instruction deems to be a fair and equitable distribution of State moneys so that every district can afford to meet its basic needs for providing an ample educational opportunity, and at the same time recognizing that some districts must have more money than others to attain the same relative standards, a complicated formula for State contributions has been devised and is now applied by the State Superintendent of Public Instruction to distribute among the districts a guaranteed sum per *weighted student* based on a full year of 180 days. RCW 28A.41.130. At the risk of over-simplification, we describe it in most elemental terms:

In applying this statutory system for State funding, the State, under RCW 28A.41, guarantees to each district $365 each for what is professionally described as a "weighted pupil." To determine what is a "weighted pupil," the superintendent's office applies a formula by taking the average yearly enrollment of the district, counting kindergarten children as one-half, and makes increased allowance for educating different categories of students among the various districts. Among these variations are .3 to be added for each high school student; .2 for each vocational student. The formula also allows an extra .25 for interdistrict col-

laboration and cooperative services, and provides some additional amount to encourage in-service education and to upgrade the educational system by higher certification, and for academic degrees and experience in the educational staffs. Thus, the "weighted student" enrollment is different from the actual number of students in daily average attendance. It is this "weighted student" enrollment that is multiplied by the $365 guarantee which constitutes the State's contribution to the school funding system. By means of the "weighted student" enrollment formula, the State increases its contribution among all the 320 districts indiscriminately for those categories of students conceded among educators to require additional money to provide them with reasonably standardized educational opportunities.

Petitioners do not contend that the "weighted student" formula for distributing State moneys to the 320 districts is unconstitutional; and there is no serious argument that it is unsound or unfair. The formula recognizes that it costs more money apparently to provide a student with a vocational or high school education than for elementary or kindergarten training, and there are times, of course, when some districts will have a higher ratio of the former than do other districts.

But that is not the end of the formula. The State also makes two deductions from that total fund realized by multiplying $365 times the number of "weighted students." It deducts 85 percent of the amount the school district would raise from 14 mills levied upon 25 percent of the fair market value of taxable real estate within the district; and it also deducts from the "weighted student" guarantee the amount each district raises from such items of revenue as "nonhigh receipts, in lieu of tax receipts, real estate excise taxes, state forest funds" and a few other small items of revenue. It reimburses all of the various districts for a high percentage of their costs of student transportation.

This, of course, represents only the most elementary pic-

ture of what is a highly complicated but long-standing procedure. Unless the existing system is unconstitutional, however, then all changes whether for better or worse must come from the legislature and cannot be initiated by this court.

Is the present system of funding and distributing the money for the public schools unconstitutional and, therefore, void? Has the State failed, and is it now failing, to discharge its duty to make ample provision for educating all children within its borders by means of a general and uniform system?

If petitioners are right in their contentions and the differences in assessed valuation per student among the districts engender an unconstitutional disparity, then special millage levies will enhance such disparities among the districts, and it then follows that special millage elections, emphasizing as they do the differences in property valuations, would also be intrinsically unconstitutional. No such premise is established by this record.

In a record replete with graphs, charts, bulletins, tables, reports and other documents relating to the public schools of the state and particularly funding and disbursements, most of which were compiled from or consisted of data supplied by the Office of Superintendent of Public Instruction, along with the testimony of several experts in the field of education, there is no proof that this State has ever failed to discharge its paramount duty, as prescribed by Const. art. 9, § 1, to "make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." The closest any witness came to reaching such a conclusion was one who said that, after three successive millage failures, his district had to cut a number of courses and reorganize classes and curriculum and he thought this left his district below State standards. Significantly, petitioners' briefs make no point of this testimony nor even allude to it. There was no evidence that any child had been

deprived of accreditation, promotion or admission to other schools because his district failed to meet State standards or that any student or parent had been forced to bring suit to compel his district to provide classes that met State standards. Nor was it shown that the Office of the State Superintendent of Public Instruction had held any petitioner district to be substandard. Nor is it contended that any child in any petitioner district, or any other district for that matter, would be without remedy in the courts in particular cases for want of an ample opportunity for an education. Nor can one conclude from the evidence in this case that the legislature has failed to provide for a general and uniform *system* of public schools including common schools and high schools and normal schools and technical schools as prescribed by Const. art. 9, § 2.

The case, as noted, comes here upon the original application of 25 of the State's 320 school districts, school directors, parents of school children, and children regularly enrolled in and attending the public schools of the respective petitioner districts. Absent from the case are the other 295 districts containing by far the greater majority of all school children in the state. We have had no trial in the true sense of the word. Petitioners ask this court by extraordinary writ for a sweeping decree of unconstitutionality to be directed against the entire public school system of the state. The record is notably silent as to what constitutes an ample opportunity for an education. Petitioners make virtually no showing whatever as to the standards or curriculum which is or ought to be necessary to meet the State's duty to provide a common school education for all children, and supply no comparative basis for a ruling as a matter of law that the State has not been and now is not discharging its paramount duty, or whether it is exceeding it. The entire case is thus based not upon curriculum deficiencies and lack of educational opportunities but rather upon financial and property valuation comparisons derived almost exclusively from statistical data, information and reports issued

by the Office of the Superintendent of Public Instruction and the various school districts of the state and attendant charts, graphs and tables.

Petitioners' major claims of unconstitutionality, as indicated, are based on inequality in assessed valuation. Their claims do not arise, therefore, from asserted deficiencies in curriculum, but stem largely in this case from the idea that districts with lower assessed valuation per student raise less money per mill in special levies, or are less inclined to vote the extra millages in special elections. Thus, it is argued the school funding statutes and scheme are unconstitutional because local property taxes represent a substantial part of school revenues; that disparities in these revenues develop among the various districts because they reflect differences in assessed valuation per student; that these differences in valuation in turn are reflected in both the amounts derived from special millage elections and the voters' general inclination in districts of low valuation to reject special millages. All of this, it is said, produces in turn unconstitutional inequality in educational opportunities available to children throughout the state. Differences arising from variances in local tax income per student, it is said, reflect unconstitutional differences in expenditures per student. Thus, the whole system, petitioners argue, is made unconstitutional because of claimed variances in educational opportunities stemming largely from differences in assessed valuation per student.

But the record does not bear out these claims of unconstitutional inequality of educational opportunity. There is no evidence whatever that one district or another provides unconstitutionally superior or unconstitutionally inferior opportunities; nor is there evidence as to which are the better or inferior of offending districts, if any, one way or another; nor is it denied that due to social, economic and demographic differences some districts will require substantially more money than others to provide approximately the same level of educational opportunities. Conclusions of fact resting largely as they do upon opinion and

conjecture and drawn from the statistical data in the record, as will be shown, do not sustain the assertion of unconstitutional failure of the State to fulfill its duty.

Mr. Francis Flerchinger, from the Office of Superintendent of Public Instruction, with 11 years' experience in that work, testified that he had spent more than a year as a staff member of a committee studying the State school aid formula to determine whether there should be revisions in the school formula proposed. These studies, he said, had been continuous throughout the 11 years of his career, and it can be assumed as a matter of commonsense, that they have been going on at least for the last 40 or 50 years. The most current study in which he was then engaged, he said, had been initiated at the request of the State legislature.

Mr. Flerchinger testified that differentiations in assessed valuations had little or nothing to do with the quality of education supplied by the various districts. One criterion, he said, which is not controlling but significant is that which is called "basic expenditure per pupil." These basic expenditures

are arrived at by subtracting from the total expenditures those items received by only some of the school districts including the expenditure for food services, transportation, all specially funded state and federal programs and those payments received for providing services to other school districts. The figure is then divided by the number of pupils.

He pointed out that the basic expenditures per pupil could and did vary to an extraordinary degree from a high of $4,517 per pupil down to $470 per pupil, but that the quality of education between the two districts might be about the same or the differences imperceptible. Thus, the Patterson District, with only 5 children in the entire district, had the highest basic expenditure per pupil, but could not be said to be providing superior educational opportunities than those of all of the other districts whose similar expenditures per pupil were much lower.

Referring to some of the charts, graphs and exhibits, Mr.

Flerchinger said that the mean basic expenditure per pupil per district for all 320 districts in the state was $819, that the existing standard deviation from the $819 was $292, and that 158 of the largest school districts in the state contained 95 percent of the State's school pupils. Adverting to the mean expenditure per pupil for these 158 districts containing the 95 percent of the school population, he said it amounted to $667 with the standard deviation of only $84 as contrasted with $292 from the $819 mean basic expenditure for all 320 districts.

In Mr. Flerchinger's judgment, illustrated by reference to the material contained in the graphs, charts and other exhibits, he explained why there is a difference in the ratio of certificated staff per 1,000 students among the school districts in Washington. Here is his testimony on that point:

> Q. From your observation of the data contained in the study on public school financing and from your general experience with the public school system, do you have an opinion as to why the size of the enrollment in a district is the main factor which explains differences in the number of certificated staff per 1,000 students? A. It has to do with basically the availability of students. Patterson, the smallest district here, has a staffing ratio of 200 certificated staff for 1,000 pupils. They don't have 1,000 pupils, they have 5, and they have 1 staff member. And you just concentrate on this end of the graph, the smallest districts, you can see the staff going down, because when they add that additional pupil, when they go from 5 to 6, that is a very significant change in the staffing per 1,000 pupils and in fact carries on throughout this. It is not a uniform effect because there is a mixing of districts in here, both elementary and secondary, and the staff ratios are different between elementary and secondary.

He thus concluded that one of the primary determinants of the differences in the basic expenditures for the school children of the state is mainly a result of the variations in the number of certificated staff members per 1,000 students. He carried this analysis one step farther by saying that 75 percent of all the variations in expenditure per pupil in

Washington are accounted for by differences in pay and the differences in the number of certificated staff per 1,000.

Revenue for the schools, Mr. Flerchinger said, comes almost entirely from seven sources: (1) local taxes; (2) county administered funds; (3) State funds; (4) federal funds; (5) nontax revenue receipts; (6) nonrevenue receipts; and (7) payments from other districts. From these funds, Mr. Flerchinger testified, of the moneys going to each district: 31.38 percent are accounted for by local taxes for the state as a whole; 2.71 percent are county administered funds; 53.59 percent are State funds; 6.40 percent are federal funds; .82 percent are nontax revenue receipts; 3.53 percent are nonrevenue receipts; and .02 percent are payments from other districts.

The State treasury by statute receives 2 mills from each district and sends this money back to the district, and these 2 mills account for an item of 4.59 percent included in the above 53.59 percent of State funds. Since the conclusions of fact to be drawn from the evidence consist in this case almost entirely of interpretations, evaluations and comparison of the statistical data issued regularly from the Office of the State Superintendent of Public Instruction and the school districts, conclusions of constitutionality or unconstitutionality must be drawn from that same data. Petitioners' contentions, if sustained by this court, might well operate to reduce the quality of education in the state by converting the lowest common denominator, i.e., assessed valuation, into the highest common denominator, and thus eliminate the major inducements for the various districts by means of special millage elections to promote and elevate the status of its schools above the minimum State standard.

Although the figures, depending upon how they are interpreted, may show that State school funds in the past 12 years have dropped from about 62 percent of the total funding to about 50 percent at present, this decline is due not to decreases in State funds but largely to increases in school funds from local property taxes. Local tax revenues

for the schools in this same 12-year period have risen from about 22 percent of the whole to nearly 36 percent. The significant part of this, however, is that funds from both sources have increased enormously in the past 12 years, the changing ratio being due to the fact that local school funds have increased more than State funds.

Differences in assessed valuation shown from the material before us have little to do with meeting State standards of education. Enrollment, rather than valuation, is the more significant key. Thus, for statistical purposes, the principal graphs and tables received in evidence are based on data from the 158 largest districts out of the total 320 districts in the state. Their significance is apparent when it is shown that these 158 districts contain 95 percent of the entire school enrollment. Among these 158 districts, there is, said Mr. Flerchinger, a standard deviation of .85, a point not fully explained in the testimony. In another context, the total expenditure per pupil per district would be $819, but the mean expenditure per pupil for the 158 of the large districts is $667. Thus, Mr. Flerchinger, using the data and charts received in evidence as a basis for his conclusions as earlier indicated testified as follows:

Q. Can you compare the data in Respondents' Graph No. 35 with Respondents' Graphs Nos. 28 and 29? A. Yes. Q. Have you? A. Yes, we have. We performed a calculation called a step which is multiple regression analysis, which is a method of arriving at relating the interrelationships of the, in this case the three variables in such a manner you have eliminated the complications of the other variables on the main variable. In this case we are attempting to shall we say account for the basic expenditure per pupil and the program selected, the computer selected as the two primary factors the average pay for certificated staff and a staffing ratio per 1,000 pupils as accounting for 75 percent of the variation in the expenditure per pupil. Q. So what you are saying is that 75 percent of all the variations in expenditure per pupil in Washington are accounted for by differences in pay and the differences in the number of certificated staff per 1,000? A. That's correct.

He testified accordingly that the basic expenditure per pupil, as evidenced by graph No. 28 in evidence, would show little as to the differences in quality of education between large districts and small districts. When measuring the quality of the actual program conducted within the classroom there is, he said, "little that you can say from that graph."

Accordingly, he said, neither the teacher-student ratio nor the expenditures per pupil were adequate criteria for explaining or judging the quality of education a student is receiving in the various school districts of the state. Thus, alluding to a graph showing the relationship of expenditures per pupil to assessed valuation, he said that the higher assessed valuation per pupil in the larger districts is generally associated with a declining student enrollment. The size of the district, as measured by enrollment, he concluded, is the factor which most explains the difference between assessed valuation per pupil. He testified:

> If you divide assessed valuation . . . by the number of pupils in the district, the smaller districts are going to have the higher valuation. The other factor that comes in, of course, is the basic property within the district, the total valuation. But the diviser in that equation, that is the number of pupils, changes the other factors very significantly.

He concluded on this point:

> If you are taking the state as a whole, the smaller districts in expenditure per pupil bear an inordinate weight in the computation of the correlation coefficient of .85 which is the relationship between those two variables, and if you analyzed that smaller 162 and actually play around for a moment with the enrollment by adding one or two pupils here or there, you can significantly change that, and so therefore you have to conclude from that that the enrollment or the number of pupils available in the district as the diviser of these two factors has a very strong significance on the expenditure per pupil and the assessed valuation per pupil, and therefore it provides a spurious relationship when you do a statistical analysis using those two variables.

Variations in expenditures per pupil and assessed valuation per pupil are both mathematical functions of enrollment—a conclusion of ultimate fact inevitably to be drawn from the evidence in this case and as a matter of commonsense.

Referring to exhibit No. 53, Mr. Flerchinger testified that, if the expenditures for all 320 districts were considered, the mean or average per district for the 1970-71 year would be $819, but that the mean for the 158 larger districts comprising 95 percent of the school population would be $667. And of these 158 districts, 86, or 54 percent, would be below the mean and 72 districts or 46 percent above it.

Dr. Larry Bundy, Director of Office and Management Systems, and formerly Administration and Finance Consultant in the Office of the Superintendent of Public Instruction, agreed with Mr. Flerchinger's interpretation of all of the data put in evidence and his conclusions of fact from it. Speaking of the differences in assessed valuation per pupil and comparing these to the expenditures per pupil in all 320 districts, Dr. Bundy testified:

Q. Have you had occasion to compare and study the amounts of assessed valuation per pupil and compare them with expenditures per pupil between the different school districts of the State? A. Yes, I have. Q. What have you found? A. Taking the three hundred twenty districts that existed, represented by the '70-'71 data, we observed that there was a fairly strong relationship between those factors looking at all the districts; however, if you break them into segments representing the first one hundred fifty-eight districts representing the bulk of the student population as the statistical population, then the relationship between those two factors is not nearly as great or nearly as statistically significant. Q. Would you say that there is not a significant relationship between assessed valuation per pupil and basic expenditure per pupil when one hundred fifty-eight school districts which contain ninety-five percent of the students of the State are compared? A. I would say there's a relatively insignificant relationship.

Then referring to the 158 districts which contain 95 percent of all students in the state, he testified as follows:

Q. (By Mr. Coats) Would you say that there is a significant relationship between the assessed valuation per pupil and basic expenditure per pupil when the one hundred fifty-eight school districts which contain ninety-five percent of the students of the State are compared? A. I would say there's a relatively insignificant relationship between those two factors concerning the one hundred fifty-eight districts. Q. Would you say the relationship between assessed valuation of property per pupil and basic expenditure per pupil in the one hundred sixty-two school districts which contain only five percent of the students is primarily explained by the small school districts' tendency to be sparsely populated and not by a causal connection between assessed valuation per pupil and basic expenditure per pupil? A. Yes. Q. Have you found from your study that there is any credible evidence which shows that a wealthy child or the child of wealthy parents has a better chance of having a high basic expenditure on his public education than a poor child or the child of poor parents in the State of Washington? A. No. Q. In your study, have you found any evidence which indicates that a wealthy person is more likely than a poor person to live in a school district with a high assessed valuation per pupil? A. No.

Dr. Bundy testified categorically that, from his analysis of the relationship between assessed valuation per pupil and expenditures per pupil in Washington, a school district with high assessed valuation is not more likely to pass a special levy than a school district with low assessed valuation per pupil. He said he had made a systematic study of valuations, property and taxes and that not only was there no credible evidence that people from wealthy families tend to live in school districts with high assessed valuation per pupil, or that poor families tend to live in school districts with low assessed valuation per pupil but that his studies showed the exact opposite to be true. Using the State's largest district, that of Seattle, he made this clear. This evidence is convincingly demonstrated by a bar chart

showing assessed valuation per student in 10 of the State's largest districts as follows:

Seattle ........................$35,393
Spokane .......................$16,245
Tacoma .......................$17,518
Highline ......................$12,124
Edmonds ......................$12,394
Bellevue ......................$16,627
Shoreline .....................$13,964
Vancouver ...................$17,818
Renton .......................$29,154
Federal Way .................$ 8,757

The petitioners' whole case was based on the unconstitutional effect upon education stemming from differences in assessed valuation. But a glance at the above figures will demonstrate its fallacy. According to these samples, Seattle district, with an assessed valuation per pupil of $35,393 should be reveling in a surplus of money, and Tacoma with about half that, at $17,518 virtually unable to open the school doors; by comparison, Bellevue School District with only $16,627 assessed valuation per student would be so substandard as to be unworthy of claiming a right to participate in discharging the State's paramount duty. Then, of course, Federal Way at $8,757, when compared to the apparent opulence of Renton, at $29,154, would have to be classified as an educational disaster area.

Mr. Llewellyn O. Griffith, Administrative Consultant for Special Services, Office of State Superintendent of Public Instruction, testified that this State had accreditation standards issued yearly, but that they applied to high schools only. He said that the State Board of Education also "approved" public schools from kindergarten through grade 12, which presumably gives the State some authority in requiring that the schools meet certain minimum standards. There is, however, no recognized standard in use or yet devised for measuring precisely the quality of education a child is receiving in a given school district. Conceding the

obvious, that money is essential to operating the schools, he testified that it is not easier to raise money by a special levy in districts that have a higher assessed valuation; nor that it is more difficult to raise money by special levy in districts that have a low assessed valuation. When asked by the court what would be the principal factor in passing special levies, he testified:

> This depends entirely upon the policy of the school district. In my personal knowledge, in my opinion now, a good many districts set the level of a special levy on the basis of interrogation of a few business people downtown and what they will stand; they do not make that judgment on the basis of what quality is required in that school in order to give the pupils in that school a comparable education with the district next door or elsewhere, and that is why I said that it is the quality of the authority, their insight into what children need, their feeling for children, rather than anything else that makes a good school board.

Whatever disparities exist in the quality of education—and Mr. Griffith did not in any way intimate that any district failed to meet the minimum standards necessary to meet the State's paramount duty—stemmed, he said, not from variances in assessed valuation, but from numerical differences in population. Pointing out the main reason for differences, he said:

> As long as we allow school districts to exist whose boundaries do not encompass sufficient students to make a reasonable per pupil expenditure, we will have bad education in pockets across the State.

There is no showing here that even the districts which seem to be in more dire financial straits than others have failed to meet those standards of educational opportunity which can fairly be said to be embodied in the duty of the State.

The same lack of relationship between assessed valuation per student and quality of educational opportunity appears in an examination of another bar graph pertaining to and

showing the assessed valuation per student among the following districts:

Clover Park ....................$10,784
Lake Washington ...............$14,061
Kent ..........................$17,889
Everett .......................$25,338
Yakima ........................$15,559
Puyallup ......................$11,896
Northshore ....................$12,515
Central .......................$10,441
Bellingham ....................$17,109
Longview ......................$34,060

Thus, Northshore has a substantially higher assessed valuation per student than either Clover Park or Puyallup or Central and a modest amount less than Lake Washington, and one can draw no rational conclusion whatever from these differences as to the degree, if any, by which one district or the other, if any, fails to provide adequate educational opportunities for the children within its borders.

Petitioners here make much of the truism that it takes more mills for a district of low assessed valuation to raise the same amount of school money than it does in a district with a high assessed valuation. Thus, according to one bar graph, 11.1 mills will raise $392.47 per enrolled pupil in Seattle; 24.2 mills to raise $211.71 in Federal Way; 24.4 mills to raise $296.33 in Highline; 15.9 mills to raise $278.12 in Tacoma, while 28.7 mills will raise $358.92 in Northshore. But these graphs repudiate the very basis upon which petitioners would have us void the school statutes. Even this very limited comparison of but 5 of 320 districts shows that Northshore, by raising $358.92 from 28.7 mills is much better off financially under petitioners' theories than is Highline, for example, which raises only $296.33 from a 24.4 millage, and Federal Way which gets only $211.71 from 24.2 mills.

That the assessed valuation per pupil has little to do with the quality of education is also demonstrated in the graph

showing the number of certificated personnel per 1,000 enrolled students: Northshore, one of petitioner districts, has 50.4 certificated personnel per 1,000 students whereas Shoreline district has only 39.6 certificated personnel per 1,000 students. Renton has 46.3 certificated personnel per 1,000 students; Federal Way, 46.9; Kent, 48.7; Clover Park, 49.3; Edmonds, 50; Auburn, 50.7; Highline, 51.6; Lake Washington, 52.5; Mercer Island, 54.9; Seattle, 55.8; Issaquah, 55.8; Bellevue, 55.8; Tacoma, 56.4; and South Central, 56.5. According to this, petitioner Northshore is much better off than Shoreline, Renton, Federal Way and Kent and about on a parity for certificated personnel per 1,000 students with Clover Park, Edmonds, Auburn and Highline.

These figures, taken largely from the Superintendent of Public Instruction's Office show conclusively that assessed valuation per pupil not only has little to do with the quality of education in the enumerated districts, but that no decision as to the equal protection of the laws nor the paramount duty to provide uniform education can be based upon it. The significance of assessed valuation per pupil is thus inconstant, tenuous, superficial and coincidental only.

Accordingly, petitioners' first claim of unconstitutionality, that children who live in school districts with low assessed valuation of property per pupil are denied equal protection of the laws contrary to the fourteenth amendment to the United States Constitution and Const. art. 1, § 12, and, therefore, are victims of the State's failure to discharge its paramount duty to them, is not only not supported by the evidentiary data in the case, but is essentially disproved by it.

The record also fails to vindicate petitioners' position that differences in assessed value among the districts denies equal protection to the taxpayer. That it takes more millage to raise the same amount of dollars on low valued property than it does on high valued property is no more than a meaningless truism and can be answered with another truism that the lower the value of one's property the lower

one's taxes, neither truism having anything to do with the equal protection clause of both constitutions so long as everybody in the taxing scheme pays the same rate. Differences in assessed valuation per pupil among the various districts do not to a constitutional degree substantially affect the amounts of revenue per pupil available nor the amount expended per pupil; nor the cost per pupil in providing about the same quality of education throughout the state. Disparities among the districts, it is shown in this record, arise not only from variances in revenue raised but in the necessary differences of money to be spent because: (1) Differences in appraisals of property for tax purposes by assessors may persist in the various counties. As between districts in different counties, a systematically high appraisal will produce more school revenue than a systematically low appraisal; (2) A lowering of the State's share has dropped from 59.2 percent of the total in 7 years to 49 percent, not because of a decrease in State appropriations but largely because the individual districts have put up proportionately more from local taxes and special levies; (3) All things are relative and, short of abolishing separate districts and converting the state into one school district, the disparities in tax revenues from the various areas of the state will persist; (4) Converting the entire state into a single district will not alter the differences in expenditures necessary to provide a substantially uniform system affording reasonably equal educational opportunities in the different areas of the state for the obvious reason that costs per child will vary due to the infinite differences in geography, climate, terrain, social and economic conditions, transportation and special services, and local choice as to extra curriculum and special services to be made available in consonance with the State's minimal requirements.

■ Where one district may offer a richer program in music and dramatic arts, another may go beyond the State's requirements in science or social studies, or physical education or agriculture, and others may emphasize more

than one field of student activity beyond the college preparatory phases. One district may supply a more comprehensive remedial program for physical behavioral and emotional problems, and another may provide less than some experts may deem to be minimal. These are choices which inhere in the idea of viable local participation in establishing, operating and funding the common schools. If these differences are of constitutional dimension, there exists a remedy in equity to compel the particular school district or the State in a particular case to provide such services, but that is not the remedy these petitioners are seeking.

Most of the data put into evidence, as earlier noted, came from the Office of the Superintendent of Public Instruction and some from the superintendents' offices of local school districts. From these statistics, the State has published a table showing comparative sources of revenue for the past 10 years.

Even a cursory examination of the following table will show that the State has striven not only to discharge its paramount duty but perhaps to exceed it. Where local funds derived from all local revenues including $11-plus millions in real estate excises, $72-plus millions from local real and personal property taxes, and miscellaneous other local taxes totaled $106-plus millions in 1962-63, the State contribution was $209-plus millions for that year. In 10 years the total local funds derived from all local sources had climbed to $312-plus millions, but the State funds contributed to the common schools had at the same time escalated to $391-plus millions. One must remember that the local funds include taxes levied on property in the districts and 2 mills allocated by the legislature to the State and returned to the districts and not deemed a part of the State's contribution. Taking into consideration the components and sources of all revenues for the common schools, the State can prudently contend that it has surpassed the requirements of a paramount duty and by comparison has done as good, if not better, a job to meet its State responsi-

710

ACTUAL SCHOOL DISTRICT GENERAL FUND RECEIPTS 1964-65 TO 1974-75 INCLUSIVE
DOLLAR TOTALS IN MILLIONS AND PERCENTAGE OF TOTAL IN ( )

| School Year | Local Property Tax (Including Special Levy) | Real Estate Excise Tax | Other Local Funds① | Federal Funds | State Funds | Total② | Special Levies Approved By Voters and Collected |
|---|---|---|---|---|---|---|---|
| 1964-65 | $93.0 (25.5) | $12.0 (3.4) | $23.8 (6.5) | $19.6 (5.4) | $215.3 (59.2) | $363.6 | $32.6 |
| 1965-66 | $100.5 (24.8) | $14.5 (3.6) | $24.9 (6.1) | $30.4 (7.5) | $195.7 (58.0) | $366.0 | $35.3 |
| 1966-67 | $120.0 (26.5) | $16.8 (3.7) | $27.3 (6.0) | $36.7 (8.1) | $252.4 (55.7) | $453.2 | $41.9 |
| 1967-68 | $132.2 (26.1) | | | | | | |
| 2-Mill Rev. | 16.0 (3.2) | | | | | | |
| Total 1968-69 | $148.2 (29.3) | $21.7 (4.3) | $32.0 (6.3) | $36.9 (7.2) | $268.4 (52.9) | $507.2 | $62.6 |
| | $152.9 (26.7) | | | | | | |
| 2-Mill Rev. | 26.2 (4.6) | | | | | | |
| Total 1969-70 | $179.1 (31.3) | $23.7 (4.2) | $35.4 (6.2) | $38.0 (6.7) | $294.8 (51.6) | $571.0 | $71.8 |
| | $190.6 (29.1) | | | | | | |
| 2-Mill Rev. | 29.8 (4.5) | | | | | | |
| Total 1970-71 | $220.4 (33.6) | $21.1 (3.2) | $37.9 (5.8) | $43.8 (6.7) | $332.4 (50.7) | $655.6 | $97.8 |
| | $232.0 (31.5) | | | | | | |
| 2-Mill Rev. | 33.8 (4.6) | | | | | | |
| Total 1971-72 | $265.8 (36.1) | $18.3 (2.5) | $37.2 (5.1) | $53.9 (7.3) | $360.7 (49.0) | $735.9 | $130.9 |
| | $256.5 (33.2) | | | | | | |
| 2-Mill Rev. | 37.0 (4.8) | | | | | | |
| Total 1972-73 | $293.5 (38.0) | $21.1 (2.7) | $35.1 (4.5) | $69.7 (9.0) | $354.1 (45.8) | $773.5 | $175.2 |
| | $261.2 (33.3) | | | | | | |
| 2-Mill Rev. | 20.6 (2.6) | | | | | | |
| Total 1973-74 | $281.8 (35.9) | $26.5 (3.4) | $36.9 (4.7) | $71.9 (9.2) | $367.3 (46.8) | $784.4 | $172.4④ |
| | $333.8 (36.8) | | | | | | |
| 2-Mill Rev. | 34.7 (3.8) | | | | | | |
| Total 1974-75 (est.) | $368.5 (40.6) | $29.6 (3.3) | $36.0 (4.0) | $74.7 (8.2) | $399.0 (43.9) | $907.8 | $199.8 |
| | $317.2 (33.0) | | | | | | |
| St. Prop. Tax | 92.4 (9.6) | | | | | | |
| Total | $409.6 (42.6) | $30.8 (3.2) | $36.0 (3.8) | $76.1 (7.9) | $408.3 (42.5) | $960.8 | $219.8④ |

①Lunchroom operations, student fees, sale of property, etc.
②May not be sum of other items because of rounding.
③Reflects levy losses in sizeable districts, Spokane, Renton, Shoreline.
④Beyond the 10-year period to indicate trends.
SUPERINTENDENT OF PUBLIC INSTRUCTION
STATE OF WASHINGTON—OLYMPIA
OCTOBER—1974

bilities than the districts have done to meet theirs, particularly when there has been no evidence whatever that any child in the state is without opportunity for an education of a quality commensurate with the discharge of the State's paramount duty.

All things in life are relative and related, including school financing. Petitioners, in contending the whole structure for funding the common schools to be unconstitutional and, therefore, void because of the variances in assessed valuation per pupil, cannot avoid the implication that special millage levies for the schools are unconstitutional, too. If they are correct in their first premise, the other necessarily follows for the simple reason that special millage levies in the several districts not only precisely reflect but commensurately enlarge the very disparities which petitioners say are unconstitutional. Unconstitutionality of special millage elections would necessarily follow if petitioners' theories are accepted despite the fact that provision for special levies is found in the constitution itself in Amendment 17 and Amendments 55 and 59 (Const. art, 7, § 2). If, as the petitioners now assert, it is the variations in assessed valuation per pupil among the districts which makes existing school funding and expenditures and statutes unconstitutional, then special millage elections which create or enlarge these disparities are likewise unconstitutional.

We do not think that special millage elections are, under our constitution and the fourteenth amendment to the United States Constitution, or should be held unconstitutional by the courts and thus abolished. Resolution of such an issue must be left to the people through the amendment process. Although the legislature may devise other means of financing the schools, rendering special millage elections unnecessary and superfluous, we recognize that presently these elections have their place under the existing scheme of school funding.

Special millage elections are provided for in the State constitution. They not only are consistent with local partic-

ipation in school administration but are the most vital and effective means by which the people of a given school district may maintain, improve and enhance the processes of education for their children without at the same time depriving the parents of children of other districts from doing the same. Through special millage levies, people of one district may improve the educational process without disparaging or denigrating that of another district. Special millage elections are the only means now available by which a majority of the people of the district may directly impose a tax on absentee owners of property within the district or upon corporations, neither of which send children to school in the district. Obviously these are some of the considerations motivating the people to write provisions for special millages into the State constitution and keeping them in effect.

 Aside from the undeniable fact that nothing in the school funding and expenditure laws or statute structure prevents parents from freely moving from one school district to another; or working in one district and living in another; or living in one district and paying ad valorem taxes in one or more different districts—all of which privileges make the parents members of several classes simultaneously—the evidentiary materials show that there is no correlation between rich and poor parents and high or low assessed valuation per pupil. Thus, districts of large cities with massive industrial, rail and shipping complexes, office buildings, hotels, and wholesale and retail establishments containing the visible wealth of an industrial society and an enormous assessed valuation per student, may have more poor parents per thousand than a neighboring district with low assessed valuation, or vice versa. A small district with comparatively few children may have a low per capita income but a high assessed valuation per student in comparison to a nearby larger district with high per capita income and lower assessed valuation per enrolled student. A decision of this court adopting petitioners' position could

well mandate a transfer of funds among districts so as to deprive districts of high assessed valuation but which urgently need extra local support, and require these funds to be distributed to some districts which have little or no comparative need for them. And at the same time, such a decision could readily operate to either prohibit as unconstitutional or discourage as unwarranted that extra local support for the schools which, under the present scheme, can be provided only by special levies.

If, as petitioners assert, the statutory code for funding the schools is unconstitutional because of differences in the assessed valuation per student, then the most drastic steps must be taken by the legislature to avert a closing down of the system. Although other schemes may be available, we can think of at least seven sweeping changes in the statutory code that such a decision might demand:

1. Abolish all school districts and convert the State into a district of the whole; or

2. Abolish all special school levies, thus eliminating the root cause of so-called unconstitutional differences; or

3. Keep the separate districts but have all school moneys collected by the State and apportioned out among the districts on an equal basis per student so that each district will receive in dollars the same amount per child per day of attendance; or

4. Establish a lowest common denominator level of educational standards and prohibit individual districts from exceeding it by means of local funds; or

5. Revert to a system of education in the basic 3 R's to the eighth grade, thus assuring a kind of mathematical uniformity of standards throughout the state; or

6. Redistrict the State into districts of approximately equal student population and apportion to each child an equal sum in dollars to be allocated by the State and at the same time prohibit local tax support; or

7. A combination of two or more or all of the above theoretical devices, including a redistribution of funds from

districts with high assessed valuation among those with low valuations under a scheme sometimes described as power equalizing.

But whether to continue under the present statutory scheme or initiate a new one are decisions for the legislature and the Board of Education and the Superintendent of Public Instruction and not the courts. Suffice it to say we do not find that differences in assessed valuation operate to deprive taxpayers among the several districts of equal protection of the laws.

Petitioners next contend that, when section 1 of article 9 declares it to be "*the* paramount duty of the state to make ample provision for the education of all children" that expression must be given overwhelming and overriding application. They attach extreme import to the article "the" in the phrase "the paramount duty" and give it a significance we think far beyond the intent with which it was employed. As heavy as the duty may be acknowledged to be—and no one denies that free public education is one of the great responsibilities of the state—we cannot construe the phrase to have such indomitable consequences in relation to all other parts of the State constitution. We must, in ascertaining the intent and meaning of article 9, section 1, apply the generally accepted rules of constitutional interpretation.

█ . It is a general rule of constitutional law that fundamental principles are of equal dignity and "neither must be so enforced as to nullify or substantially impair the other." *Dick v. United States,* 208 U.S. 340, 353, 52 L. Ed. 520, 28 S. Ct. 399 (1908). "[N]o constitutional guarantee enjoys preference, so none should suffer subordination or deletion." *Ullmann v. United States,* 350 U.S. 422, 428, 100 L. Ed. 511, 76 S. Ct. 497, 53 A.L.R. 1008 (1956). Every statement in a state constitution must be interpreted in the light of the entire document, and not sequestered from it, and none is to be considered alone. *Bower v. Big Horn Canal Ass'n,* 77 Wyo. 80, 307 P.2d 593 (1957); *Runyon v. Smith,* 308 Ky. 73,

212 S.W.2d 521 (1948); *Grantz v. Grauman*, 302 S.W.2d 364 (Ky. App. 1957). Recourse should be had to the whole instrument. *People ex rel. Balcom v. Mosher*, 163 N.Y. 32, 57 N.E. 88 (1900). The court long ago said that the intent of the constitution must be derived from the instrument as a whole (*State ex rel. State Capitol Comm'n v. Lister*, 91 Wash. 9, 156 P. 858 (1916)), and the State constitution must be construed in the sense in which our framers understood it in 1889. In other words, "its meaning was fixed at the time it was adopted." *Boeing Aircraft Co. v. Reconstruction Fin. Corp.*, 25 Wn.2d 652, 658, 171 P.2d, 838, 168 A.L.R. 539 (1946). Thus, it is the function of this court, while giving full effect to all provisions of the constitution, to harmonize wherever possible any seeming conflicting provision so that the whole constitution is left intact.

■ Article 9, after declaring the duty, places it squarely upon the legislature and the Superintendent of Public Instruction and not upon the courts. Then, in that same article 9, it enumerates the special funds which shall be devoted exclusively to public education. What constitutes ample provision for an education, according to article 9, shall be prescribed, therefore, not by the courts but by those organs of government to whom the task is allocated by the constitution with constitutional authority to utilize the designated funds in carrying out the duty.

No one connected with this case doubts the importance of education to the welfare of the people of this state, nor that it plays a vital role in the maintenance and furtherance of this democracy. But to give section 1, declaring the duty, the extreme significance contended for is another matter. We cannot hold this duty to be the be-all and end-all, the alpha and omega of state government. The State has other duties and responsibilities, some of equal and others of lesser importance, and the article *the* in the phrase *the paramount duty,* so masterfully emphasized by petitioners, must be kept in interpretive context first with the remaining sections of article 9 and then with the entire State

constitution or it will overturn a major body of constitutional law in this state without any amendment to the constitution whatever. If, as their argument implies the term "the paramount duty" to make ample provision for the education of all children imposes a supreme and overriding duty upon the State to the denigration or reduction of all other duties constitutionally imposed or statutorily assumed, then it follows that any tax may be imposed and any public funds, whether from the gasoline tax, the courts, public assistance appropriations, retirement systems, and revenues from all fees, licenses and franchises may be preempted and allocated to the schools by decree of this court upon a declaration of "the paramount duty." This, of course, was not the intendment of the constitution for the phrase "the paramount duty" must be construed in context with the rest of article 9 and the entire constitution which, for example, imposed a paramount duty upon the judges to administer justice, by creating the very system in which they are to serve, and the legislature to legislate, by creating that organ of government, and the Governor and other specified officers to administer and execute the laws according to the statutes by creating an executive department in article 3.

Granted then the great importance of education to the public welfare, it should be noted that *the* paramount duty to make ample provision for the education of all children within its borders, without distinction or preference on account of race, color, caste, or sex, makes the legislature primarily and the Superintendent of Public Instruction—a constitutional officer whose office is established by article 3, sections 1 and 3 of the constitution—and not the judiciary the determinants of whether and in what manner this paramount duty is to be discharged. On this point, the legislature has acted.

RCW 28A.04.120 sets forth the authority and duty of the State Board of Education in carrying out the State's constitutional duty to provide for an ample education, as follows:

In addition to any other powers and duties as provided by law, the state board of education shall:

. . .

(4) Examine and accredit secondary schools and approve, subject to the provisions of RCW 28A.02.200, private and/or parochial schools carrying out a program for any or all of the grades one through twelve: *Provided*, That no public or private high schools shall be placed upon the accredited list so long as secret societies are knowingly allowed to exist among its students by school officials.

(5) Make rules and regulations governing the establishment in any existing nonhigh school district of any secondary program or any new grades in grades nine through twelve. Before any such program or any new grades are established the district must obtain prior approval of the state board.

(6) Prepare such outline of study for the common schools as the board shall deem necessary, and prescribe such rules for the general government of the common schools, as shall seek to secure regularity of attendance, prevent truancy, secure efficiency, and promote the true interest of the common schools.

. . .

(8) Continuously reevaluate courses and adopt and enforce regulations within the common schools so as to meet the educational needs of students and articulate with the institutions of higher education and unify the work of the public school system.

(9) Prepare courses of instruction in physical education, and direct and enforce such instruction throughout the state, with the assistance of the school officials, intermediate school district superintendents and the boards of directors of the common schools.

(10) Carry out board powers and duties relating to the organization and reorganization of school districts under chapter 28A.57 RCW.

RCW 28A.04.130 states:

The state board of education is hereby empowered, and it shall be the duty of said board, to prescribe rules and regulations governing the classification and numbering system of school districts, except as otherwise provided by law.

718

We have never placed so sweeping and overriding an interpretation on the phrase "the paramount duty" as petitioners now urge. Thus, in *Pacific Mfg. Co. v. School Dist. 7*, 6 Wash. 121, 33 P. 68 (1893), a statute imposing contingent liability on school districts having revenue from sources other than the common school fund established by article 9, section 3, was not held invalid but upheld. It never occurred to this court at the time that this rule might impair the State's capability in discharging "the paramount duty."

In *State ex rel. DuPont-Fort Lewis School Dist. 7 v. Bruno*, 62 Wn.2d 790, 795, 384 P.2d 608 (1963), this court declared that article 9, section 1 of the State constitution "imposes upon the state the paramount duty of making adequate provision for the education of all children residing within its borders" but that section 2 "commands the legislature to provide a general and uniform system of public schools, and Art. 3, § 22, entrusts to the superintendent supervisory authority over all matters pertaining to the public schools." This court then made a comprehensive review of the entire statutory structure, citing most of the statutes which operated to create, maintain and operate the public school system, including those statutes establishing and providing for school districts, superintendents' offices, employment of teachers and administrative personnel, the preparation of school budgets, and a host of other things related to operating the public schools. We considered at that time the various powers of and limitation upon public officers having to do with school operation and administration. At no time in the consideration of that case was it suspected that the whole statutory structure for funding and disbursing school moneys was void for unconstitutionality or that the State was failing to discharge the paramount duty.

We have held, too, that school districts have a right, under section 2, to receive State funds when appropriated by the legislature (*Island County Comm. on Assessment*

*Ratios v. Department of Revenue,* 81 Wn.2d 193, 500 P.2d 756 (1972)), but not that added local funding renders the appropriation unconstitutional. Again, in *Carroll v. Bruno,* 81 Wn.2d 82, 499 P.2d 876 (1972), the statute (RCW 28A.41.130) authorizing the State superintendent to treat 85 percent of the forest funds paid over to the affected local districts as part of the State general scheme of equalization, in effect declared a great power in the State superintendent to prescribe the mode and method of State allocations and largely to implement statutes controlling the distribution of State equalization money. And this court passed directly on the question of whether the State could preempt local taxes for school purposes in *Newman v. Schlarb,* 184 Wash. 147, 153-54, 50 P.2d 36 (1935), and in that opinion amplified the term "paramount duty." The question there was whether a county tax of 5 cents per day for each student violated either article 11, section 12, prohibiting the State from imposing taxes on counties for county purposes, or violated the equal protection provision of the Fourteenth Amendment. Holding the tax as one for State purposes and in discharge of a "paramount duty," the court said:

> The state, being engaged in the exercise of *a paramount duty,* could, of course, select any method that it saw fit in order to discharge that duty. Consequently, it reserved to the proper state officers the general supervision of the system and entrusted to its various political subdivisions certain functions and details in which they were particularly interested and concerned.
>
> . . .
>
> Consequently, the state, through the legislature, may not only require such subdivisions to levy taxes for public purposes, but may also fix the amount to be levied by them, provided that such purposes, though of a general nature and for the benefit of the whole people, result in special benefits to the particular subdivision.

Thus, it is the legislature and the State superintendent upon whom the constitution and statutes impose the responsibility of discharging the paramount duty of the State (1) to make ample provision for the education of all chil-

dren; (2) to prescribe and enforce the minimal standards necessary to constitute ample provision; and (3) to allocate State equalization funds however they may be described so that every child has access to a "general and uniform system of public schools" without "distinction or preference on account of race, color, caste, or sex."

A sensible construction of the meaning of "the paramount duty," therefore, is that, while it imposes a direct duty upon the State, the nature and extent of that duty and the means of carrying it out rest upon the legislature and the State superintendent. It means, too, that every child, in making use of the ample provision for an education, has a constitutional right to be free from discrimination or preferences accorded to others on account of race, color, caste, or sex in the discharge of that duty. Thus, although the State, under section 1, article 9, must assume the duty of making ample provision for the education of all children and is required to do so without discrimination as to race, sex, or national origin, constitutionally speaking that duty or function is the same as any other major duty or function of state government. It is to be discharged in consonance with the Fourteenth Amendment and our State's own equivalent thereof (article 1, section 12) for the two provisions in this jurisdiction have the same meaning.

Petitioners contend that, because of the paramount duty, the State's duty to administer the educational laws is so much greater under the State constitution that compliance with the Fourteenth Amendment may fall short of compliance with the State's own equal protection clause. We are of the opinion that the two provisions have the same significance and are to be construed alike. If the State's statutes controlling the funding and operation of the common schools are repugnant to the equal protection clause of the Fourteenth Amendment, they are similarly repugnant to the equal protection clause, and vice versa. In stating this principle, we adhere to a line of precedent which has steadfastly held the privileges and immunities clause of the State constitution (article 1, section 12), to

mean the same as the equal protection clause of the Fourteenth Amendment.

In *Markham Advertising Co. v. State,* 73 Wn.2d 405, 427, 439 P.2d 248 (1968), we said:

> The plaintiffs contend that the Act is contrary to the equal protection clause of the fourteenth amendment to the federal constitution and the privileges and immunities clause of the state constitution, article 1, section 12. These provisions have the same import, and we apply them as one.

Quite recently, this court, despite dissenting opinions on other points, unanimously agreed on the point that the equal protection clause of the United States Constitution (Amendment Fourteen) and the privileges and immunities clause of Const., art. 1, § 12, should be applied as one in *DeFunis v. Odegaard,* 82 Wn.2d 11, 37, n.16, 507 P.2d 1169 (1973). We were unanimous that this was a prevailing and long-standing rule of application, and one made inevitable in this jurisdiction by a long line of decisions.

In case after case, this court has given the same application to the equal privileges and immunities provisions of article 1, section 12, of the State constitution and the equal protection clause of the Fourteenth Amendment to the federal constitution and has given them both the same meaning. Thus, in *Sparkman & McLean Co. v. Govan Inv. Trust,* 78 Wn.2d 584, 478 P.2d 232 (1970), the court treated the two provisions as indistinguishable. Again, in *State ex rel. Rhodes v. Cook,* 72 Wn.2d 436, 441, 433 P.2d 677 (1967), we thought the principle so well established and free of argument that we felt it unnecessary to develop a supporting rationale and treated the two as one, saying:

> The state and federal constitutional provisions for equal protection of the laws require that class legislation must apply alike to all persons within a class, and that reasonable grounds for the distinction must exist between those within and those without a designated class. *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960).

*Accord, State ex rel. O'Brien v. Towne,* 64 Wn.2d 581, 392

P.2d 818 (1964); *Mahnkey v. King*, 5 Wn. App. 555, 489 P.2d 361, 51 A.L.R.3d 1331 (1971).

Declaring this principle, that both constitutional provisions have the same significance, leads inexorably to the principle that statutes do not offend either constitution unless they are invidiously discriminatory. *Markham Advertising Co. v. State, supra; Seattle v. See*, 67 Wn.2d 475, 408 P.2d 262 (1965). And the record does not show that any child in this state—much less petitioners' children—suffer an invidious discrimination; nor is it denied that, if such invidious discrimination exists, a remedy also is available by bringing suit in equity directly against the district or State to compel that the lacking opportunity be supplied.

On the question, then, of equal protection for taxpayers, school districts, parents and children under both constitutions, uniformity based on adjustments of assessed valuations per pupil, through one device or another, not only cannot be achieved but would be undesirable and would likely create great disparity in educational opportunities afforded by the several districts. Whatever variations in educational opportunities exist, as earlier shown, derive not mainly from variances in assessed valuation nor from the enactment, rejection or even failure to present special school millages but instead from the differences in the size of the districts, their geography and location and the differences in the aspirations of the people of the district to provide opportunities beyond those encompassed in the paramount duty of the State.

That the State has, within the past 10 years, dropped its percentage of contributions to state school revenue is due not to any diminution in its purpose to carry out its paramount duty, but to increases in the local contributions. Thus, while the State's gross contributions have increased enormously, the districts' contributions have increased even more so that the ratio of State to local funds has changed.

The table of data at page 710, *supra*, supplied to the clerk of this court from the Office of the Superintendent of Public Instruction, publicly available and most of which is

included in the data put into evidence, demonstrates the steady increase in State contributions vis-a-vis an even greater increase in local contributions. Parenthetically, even these comprehensive figures do not show the entire costs of operating the schools of this state, for they do not include the State's appropriation to the teachers' retirement system.[2]

An examination of these figures (table, page 710), starting with the school year 1964-65, and using round numbers, will show that the State contributed $215 million out of a total of $363 million, and the local property including special levies contributed $93 million. During that year, with all other sources included in the total, such as the real estate excise, federal funds and other local funds, the State put up 59.2 percent of the total. By 1969-70, however, despite a more than 50 percent increase in its contribution from 1964-65, i.e., from $215 million to $332 million, the State's total percentage dropped from 59.2 percent to 50.7 percent. In the 1969-70 school year, the State put in $332 million of a grand total of $655 million, but its percentage of the total school expenditures dropped. Part of this reduced ratio is due to the enactment of the 2-mill law, i.e., 2 mills of real estate revenue placed on local property and collected for the State and then redistributed by the State back to the several districts. But primarily the changing ratio between local funds and State funds is mainly due not to any reduc-

---

[2]Following is data supplied to the clerk of this court from the Washington State Teachers' Retirement System showing legislative appropriations on behalf of the state for the teachers' retirement system in each of the past 10 years:

| | |
|---|---|
| 1964-65 | $ 13,697,000.00 |
| 1965-66 | 18,651,844.00 |
| 1966-67 | 19,093,529.00 |
| 1967-68 | 25,601,026.00 |
| 1968-69 | 21,809,588.00 |
| 1969-70 | 32,257,000.00 |
| 1970-71 | 29,263,006.36 |
| 1971-72 | 20,136,000.00 |
| 1972-73 | 35,978,000.00 |
| 1973-74 | 41,130,481.95 |

tion in the State's total contribution, which had in fact increased over 50 percent in the interim, but to an increase in special millage revenues from $32.6 million in 1964 to $97.8 million in 1969.

The ratio of state-to-local school revenues continued to change as the special millage total increased in 1973 to $199.8 million, even though the legislature steadfastly increased its total contributions year by year from $360 million in 1970-71 to $399 million in 1973-74. Steady increases in the special millage totals, federal funds, regular local taxes including the 2 mills collected by the State, culminating in a grand total of $907 million for the schools for the 1973-74 year, despite regular increased appropriations from the State, made a declining State ratio inevitable. Thus, despite nearly $400 million appropriated by the legislature, its percentage of the total, according to the table (page 710) dropped to 43.9 percent.

If, as petitioners contend, the differences created by the State's reduced percentage, despite steadily increasing contributions, make the whole system of funding unconstitutional and void, the remedy may not be to petitioners' liking: A drop of a hundred million dollars in special millage revenue from $219 million to $100 million will more than restore the State's ratio and increase its percentage well beyond 50 percent.

Not to be overlooked either is the factor of steadily rising State contributions to the common schools in the face of a steadily declining enrollment. Thus, according to *Public School Enrollment by Grade*, State of Washington Pocket Data Book, page 87 (1973), released by the Superintendent of Public Instruction, including kindergarten through grade 12, the school enrollment total of 804,753 in 1968 increased to 820,591 in 1969, but dropped to 817,712 in 1970, decreased to 805,049 in 1971, to 790,502 in 1972, and to 788,324 in 1973, and reduced to 785,457 in 1974.

■ Accordingly, recognizing the vital duties assumed by the State to educate the children within its borders, we

conclude that the method of school financing now employed is constitutional and a valid exercise of legislative power. It is a system in nearly universal use throughout the nation for it is used in about 49 of the 50 states. It is, we think, a proper method of discharging that duty—both pragmatically, for it has met the tests of experience and usage, and constitutionally, for it meets the standard of the latest authoritative word on the subject as stated in *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973).

Whether our State common school funding and disbursing system complies with the Fourteenth Amendment and article 1, section 12, is, as earlier concluded, to be decided on the premise that both provisions have the same significance and should be applied alike. This brings us to the leading case on the issue before us, *San Antonio Independent School Dist. v. Rodriguez, supra*, a direct and controlling ruling, we think, that state school funding and disbursement statutes such as ours do not offend the equal protection clause of the federal constitution, and therefore are not repugnant to this State's equal protection clause, article 1, section 12.

In that case, the United States Supreme Court reversed the judgment of a 3-judge District Court which had held the Texas school finance system unconstitutional under the equal protection clause of the Fourteenth Amendment. The trial court found that, because a major source of operating revenue for the operation of the public schools derived from local property taxes and the taxable wealth varied between school districts, the children in the so-called "rich" districts had a greater chance for high expenditures in their behalf than did the children in the so-called "poor" districts. Reversing the District Court, and upholding the constitutionality of the Texas school sytem, the court said, *inter alia*, at pages 23, 25 and 28:

Apart from the unsettled and disputed question whether the quality of education may be determined by the amount of money expended for it, a sufficient answer to

appellees' argument is that, at least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages. Nor, indeed, in view of the infinite variables affecting the educational process, can any system assure equal quality of education except in the most relative sense. . . .

For these two reasons—the absence of any evidence that the financing system discriminates against any definable category of "poor" people or that it results in the absolute deprivation of education—the disadvantaged class is not susceptible of identification in traditional terms.

. . .

We thus conclude that the Texas system does not operate to the peculiar disadvantage of any suspect class.

(Footnotes omitted.)

Characterizing the history of school financing in Texas as a perpetual state effort to enlarge and improve and expand public education, the court added, at page 39:

The Texas system of school financing is not unlike the federal legislation involved in Katzenbach [*Katzenbach v. Morgan*, 384 U.S. 641, 16 L. Ed. 2d 828, 86 S. Ct. 1717 (1966)] in this regard. Every step leading to the establishment of the system Texas utilizes today—including the decisions permitting localities to tax and expend locally, and creating and continuously expanding state aid —was implemented in an effort to *extend* public education and to improve its quality. Of course, every reform that benefits some more than others may be criticized for what it fails to accomplish. But we think it plain that, in substance, the thrust of the Texas system is affirmative and reformatory and, therefore, should be scrutinized under judicial principles sensitive to the nature of the State's efforts and to the rights reserved to the States under the Constitution.

(Footnotes omitted.)

Petitioners allude to *Serrano v. Priest*, 5 Cal. 3d 584, 487 P.2d 1241, 96 Cal. Rptr. 601 (1971), in which the Supreme Court of California had declared the school funding statutes of California unconstitutional under the Fourteenth Amendment's equal protection clause, but we do not accept

this as a controlling precedent here. Whether the *Serrano* decision will operate to void and prohibit all local funding of the public schools cannot, of course, at this juncture be ascertained, but it portends that possibility if local funding continues in that state to engender what the court concluded to be a system providing far greater educational opportunities in one district than it does in another. Nor do we think *Robinson v. Cahill*, 118 N.J. Super. 223, 287 A.2d 187 (1972), holding the New Jersey school funding system unconstitutional provides a controlling precedent for this jurisdiction.

Petitioners claim that the legislature has unconstitutionally failed to establish a "general and uniform system of public schools" as prescribed in article 9, section 2, of the State constitution. But we find this position not well taken. That school districts vary in size and taxable property does not signify that the *system* of public schools is neither general nor uniform. In determining whether the State has provided what the framers of the constitution meant by a general and uniform system, we should give weight to legislative interpretation extending over a long period of time. *State ex rel. Todd v. Yelle*, 7 Wn.2d 443, 110 P.2d 162 (1941). And while not controlled by it, we ought to consider the history of events and proceedings preceding and contemporary to the adoption of the constitution. *Yelle v. Bishop*, 55 Wn.2d 286, 347 P.2d 1081 (1959).

The first legislature after statehood enacted in 1889 an act to "establish a general uniform system of Common Schools in the State of Washington." Laws of 1889-90, ch. 12, p. 348, title of the act. That very statute, the first in a long line, created a funding system for the support of the common schools similar to the present system now under challenge. Section 53 of that statute made provision for "special taxes" of a nature resembling present special levies. That the public schools are partly funded with local property taxes does not deprive the system, we think, of those constitutional qualities described as general and uni-

form—for it is the *system* which must be kept general and uniform under that provision and not the 320 districts. A *general and uniform system,* that is, a system which, within reasonable constitutional limits of equality, makes ample provision for the education of all children, cannot be based upon exact equality of funding per child because it takes more money in some districts per child to provide about the same level of educational opportunity than it does in others. Thus, the record shows that all states of the Union, except Hawaii, recognize that taxable property values per pupil vary among the districts because expenditures per pupil vary, too. Uniformity of size and property values among school districts is not necessary to satisfy the requirements of the Fourteenth Amendment (*San Antonio Independent School Dist. v. Rodriguez, supra*) nor are they essential, we think, to a general and uniform system.

Although we do not find the ruling of the California Supreme Court in *Serrano v. Priest, supra,* to have controlling effect in deciding whether Washington's statutory system for funding the public schools is constitutional, we think that court properly declared the law in deciding that the California system did not, under the constitution, lack uniformity. Answering an argument similar to that made by petitioners here as to the failure to provide a general and uniform system, the court in *Serrano v. Priest,* supra, said, at pages 595-96:

> We have held that the word "system," as used in article IX, section 5, implies a "unity of purpose as well as an entirety of operation, and the direction to the legislature to provide 'a' system of common schools means *one* system which shall be applicable to all the common schools within the state." (*Kennedy* v. *Miller* (1893) 97 Cal. 429, 432 [32 P. 558].) However, we have never interpreted the constitutional provision to require equal school spending; we have ruled only that the educational system must be uniform in terms of the prescribed course of study and educational progression from grade to grade. (*Piper* v. *Big Pine School Dist.* (1924) 193 Cal. 664, 669, 673 [226 P. 926].)

A general and uniform system, we think, is, at the present time, one in which every child in the state has free access to certain minimum and reasonably standardized educational and instructional facilities and opportunities to at least the 12th grade—a system administered with that degree of uniformity which enables a child to transfer from one district to another within the same grade without substantial loss of credit or standing and with access by each student of whatever grade to acquire those skills and training that are reasonably understood to be fundamental and basic to a sound education. We are of the opinion, therefore, that this record fails to show that the legislature has not provided and that the Superintendent of Public Instruction does not administer a general and uniform system of public schools in this state.

It is now both fashionable and customary in judicial circles, in discussing school financing, to point out the great purpose which the states have assumed to provide free public education, and how vital this is to a democratic society, and rarely can one be found who argues against free public education or denies its worth. Without repeating the premise in extenso, we agree with that view and all of its implications. What is lacking in this case, however, is proof that the State does not make available to any of petitioner children reasonably equal opportunity for an ample education; nor is it denied that if it be shown in a proper case that some children are deprived of this opportunity they are without a remedy to compel that the opportunity be afforded them. In concluding that the State's statutory system for funding and operating the public schools is constitutional and should be upheld, we do not hold that in a proper case the courts will not provide a remedy for any child who shows that the State has failed to make ample provision for his or her education, free from all racial, religious or so-called caste distinction.

Petitioners' claim, that the entire statutory structure of public school funding and spending is unconstitutional and void, therefore, is not sustained.

The petition herein for writs of mandate and prohibition are, therefore, denied.

HUNTER and HAMILTON, JJ., concur.

ROSELLINI, J. (concurring in the result)—I agree with the opinion of Chief Justice Hale insofar as it explores the provision and meaning of Const. art. 9 and concludes that this court has not been shown any constitutional ground for invalidating the system of financing public education in this state. I therefore concur in the result of that opinion.

I do not, however, concur in those portions of the opinion which would seem to suggest that the State is now providing "ample" education for all students. There is too much public opinion to the contrary and too many facts of which the members of this court are inescapably aware to justify such a conclusion.

We know that the failure of school levies in various districts has resulted in substantial impairment of the educational programs which were thought by those whose function it is to make such judgments to have been important and necessary programs. For instance, in one school district where school levies failed twice, approximately 130 teachers' contracts were not renewed (statutory terms for termination of services). In another district, approximately 142 teachers were terminated. This impairment has, of course, been the result of expressions of popular will by means of the franchise.

Were the schools financed entirely at the State level without dependence upon the local levies, there would, presumably, be an equal distribution of financial support for schools throughout the state.

Article 8, section 6, of the Washington Constitution, provides for a system of levies at the local level, expressly including school district purposes as one of those for which municipal indebtedness may be incurred.

If a school levy fails, there may not be adequate funds to maintain an equal educational opportunity for all of its

students. Then doubts arise as to whether the State has discharged its constitutional duty to provide "ample" education. Again, where the State's share of support for education is insufficient to the extent that school districts must depend disproportionately upon school levies for operation of its schools, a constitutional infirmity may exist.

It is my opinion, based upon what I have read and observed, that the State's contribution to the cost of educating children within its borders is inadequate. The question of adequacy is one of opinion, affected by many considerations. But since the record does not clearly disclose this inadequacy, I believe that my proper function as a member of the judiciary is not to convert my personal opinion to a constitutional mandate.

For these reasons I would deny the relief sought in this action.

WRIGHT, J., concurs with ROSELLINI, J.

WEAVER, J.* (concurring in the result)—I am discomforted, chagrined, and mortified by the language of the dissent that describes the majority opinion as "a legal pygmy of doubtful origin" that "may be short-lived" done in a "cavalier manner."

On the other hand, there are certain subsidiary conclusions in the majority opinion that I do not believe necessary to the opinion and with which I do not agree. They are not, however, sufficient to deter me from my final conclusion: As I view and understand the record, petitioners have not established their case.

The petition herein for writs of mandate and prohibition should be denied; therefore, I concur in the result of the majority opinion.

STAFFORD, J. (dissenting)—This case encompasses the most important combination of constitutional, taxation and educational issues faced by the Supreme Court in its recent

---

*Justice Weaver is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amendment 38).

history. The decision has had a long, difficult, stormy, and ofttimes painful, period of gestation. Unfortunately, in the end, the opinion characterized as the majority has given birth to a legal pygmy of doubtful origin.

The result may give temporary solace to some because it will be easy to live with on a temporary basis. But, the majority opinion cannot withstand a critical analysis either factually or legally. Thus, resting as it does on a shaky foundation the current comfortable "solution" may be short-lived.

Ordinarily I would write a dissent touching only on the differences that exist in legal concepts. However, my review of the majority opinion makes it clear that such an approach will not disclose the full nature of the problem. In this instance I am concerned with more than a difference in legal concepts. I am troubled by the cavalier manner by which the majority has brushed aside the trial court's findings of fact. I am disturbed by the use of review tactics seldom experienced in appellate circles. Finally, I simply cannot accept the majority's ultimate favorable ruling on the constitutionality of financing our public schools, based as it is upon the use of appellate methods which have long since been held unconstitutional by this court.

Thus, I shall approach the analysis in two parts. The first will discuss generally the faulty approach of the majority that, in my opinion, may have an unwarranted impact upon judicial procedure far beyond the issues of this case. The second portion will present the matter based upon the facts actually found by the trial court, applying the appropriate law thereto.

## A
### GENERAL DISCUSSION

Initially, this court remanded the case to the trial court for a fact finding hearing. Pursuant to order, the trial judge held a lengthy hearing. Many witnesses testified, including experts, who opined about numerous statistical exhibits as well as other matters material to the issues before the court. Naturally, there was some conflicting testimony.

Thereafter, in the usual course of events, the trial court drafted a carefully considered set of findings of fact fully supported by the record. It is this set of findings that the majority has openly abandoned with an offhand assertion that the Supreme Court is "in an equally good position with the Superior Court to examine the whole record for a determination of those facts ultimately affecting the constitutionality of the state system of public schools."

The majority has cited no legal support for its asserted power to disregard the trial court's findings and for substituting therefor its own judgment. This is understandable because there is no legally supportable basis for such an arbitrary act. The majority's rejection of the trial court's findings rests on a misconstrued and misconceived application of a rule wholly irrelevant to these proceedings. That rule permits an appellate court to substitute its findings for those of a trial court, if, rather than being partially oral, the testimony considered by the trial court consists of depositions,[3] affidavits,[4] a bare written record,[5] or, in some instances, a written record from an inferior board or administrative agency.[6] The foregoing rule recognizes that the trial court has not seen, heard or evaluated live testimony but has merely considered the same written record as the reviewing court. Thus, both courts are equally capable of determining the facts.[7] However, this rule is inapplicable both in reason and in law where, as here, the trial court has *seen* the witnesses, has *heard* the testimony and *has weighed and resolved it* in making findings of fact. In such

---

[3]*In re Estate of Reilly*, 78 Wn.2d 623, 479 P.2d 1 (1970); *Auger v. Shideler*, 23 Wn.2d 505, 161 P.2d 200 (1945); *Standard Pressed Steel Co. v. Department of Revenue*, 10 Wn. App. 45, 516 P.2d 1043 (1973).

[4]*Holt Mfg. Co. v. Thomas*, 69 Wash. 488, 125 P. 772 (1912).

[5]*Angelus v. Government Personnel Life Ins. Co.*, 51 Wn.2d 691, 321 P.2d 545 (1958).

[6]*Nygaard v. Department of Labor & Indus.*, 51 Wn.2d 659, 321 P.2d 257 (1958); *In re Black*, 47 Wn.2d 42, 45, 287 P.2d 96 (1955); *see also Tunget v. Employment Security Dep't*, 78 Wn.2d 954, 481 P.2d 436 (1971).

[7]See footnotes 3 through 7.

event the rule is exactly the opposite of that resorted to by the majority. The credibility and weight to be attached to testimony and to the contents of exhibits is for the trier of fact and not for an appellate court. *Zillah Feed Yards, Inc. v. Carlisle*, 72 Wn.2d 240, 432 P.2d 650 (1967); *Unosawa v. Wright*, 44 Wn.2d 777, 270 P.2d 975 (1954). This includes the testimony of expert witnesses. *Barci v. Intalco Aluminum Corp.*, 11 Wn. App. 342, 522 P.2d 1159 (1974).

Contrary to the majority's unsupported assertion, the Supreme Court is not at liberty to reject a trial court's findings of fact "if evidence is present in the record to support the findings." *Sylvester v. Imhoff*, 81 Wn.2d 637, 639, 503 P.2d 734 (1972); *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959); *see also Mell v. Winslow*, 49 Wn.2d 738, 306 P.2d 751 (1957). The record makes it clear that there was ample evidence to support the trial court's findings of fact. Further, I note with interest that the majority has rejected numerous findings despite the fact that respondents *have assigned no error* to many findings most basic and crucial to the dissent's position. Thus, they must be accepted as verities. *State v. Reader's Digest Ass'n, Inc.*, 81 Wn.2d 259, 264, 501 P.2d 290 (1972).

I must admit that if the trial court's *findings of fact* are ignored, the editorialized opinion of the majority, based upon selected *testimony*, presents what appears to be a plausible position. I also must concede there is some *testimony* in the record which supports what has been written by the majority. But, based upon the foregoing discussion it should be clear that it is one thing for an appellate opinion to be based upon mere *testimony*. It is quite another to rely upon the trial court's *findings of fact*. Not only do the critical facts related by the majority lack support in the trial court's findings of fact, they frequently run counter thereto. This distinction between the majority opinion and the dissent is crucial because in this state we still adhere to *Thorndike v. Hesperian Orchards, Inc., supra.* We must follow the trial court's *findings of fact* even though some of

the *testimony* may seem to support a result that momentarily is more expedient.

Since the majority's decision requires rejection of the trial court's findings of fact, substituting therefor its own selective version of the facts based on selected testimony, the decision cannot stand under the above-cited law of this state.

The majority's assertion that the State's system of financing public schools is constitutional must be rejected for another important reason. It has been reached by an *unconstitutional*, arbitrary, usurpation of appellate power. Even if the Supreme Court is of the opinion that a trial court should have resolved a factual dispute in another way, *the constitution does not authorize this court to substitute its findings for those of the trial court. Thorndike v. Hesperian Orchards, Inc., supra.* To this I must add another statement; this court is not authorized to make findings of fact in either civil or criminal cases where the trial court has made none. *State v. Marchand*, 62 Wn.2d 767, 770, 384 P.2d 865 (1963).

If we resort to the procedural course suggested and used by the majority we might as well abandon *Thorndike* as well as reference hearings and begin trying factual issues in the Supreme Court. Of course to state the proposition is to refute it.

Before leaving the subject, I wish to make abundantly clear that every factual matter set forth in the dissent is supported by the trial court's findings of fact. Further, each finding of fact is supported by oral testimony or exhibits contained in the record. The same cannot be said of the majority opinion.

In passing, I must comment on another matter. The majority admittedly relies on some evidence apparently obtained by the Clerk of the Supreme Court, presumably at the behest of the author of the majority opinion (see table, page 710, and the acknowledgment, page 722, as well as the table in footnote 2, page 723 and the acknowledg-

ment). This adds a new dimension to the realm of fact finding hearings and the appellate use thereof. I strongly suggest that we, as an appellate tribunal, must resist the temptation to resort to such practices. We should stay within the record. If we are unwilling to police ourselves in this regard we should at least notify the parties that we have gone on a fact-finding frolic of our own lest they be surprised by an unwarranted consideration of evidence that might have been explained had they been given the opportunity.

Next, the author of the majority opinion maintains that if the present system of public school financing is declared unconstitutional the legislature might face great difficulty if not an impossibility, in replacing it with a constitutional system. I do not share this lack of faith in the legislative system. I am certain that, given the problem, the legislature is capable of reaching a proper solution.

Purely by way of anticipatory argument, the majority suggests seven changes it says "might" be required in the law if the present system of public school financing were declared unconstitutional. Some might be plausible while others are purely outlandish. The tactic is obvious. Lawyers frequently set up "strawmen" to knock down when their cases are weak on the law. The same may be said of the majority's lengthy use of the "parade of horribles" or "pandora's box" argument as it discusses (a) drastic steps that "might" be needed to avert closing the entire educational system if the financing system is unconstitutional, or, (b) theoretical impacts upon statutes governing teachers' pensions and other State activities. However, these are not facts. They are scare tactics and deserve no further comment. In this same vein, however, we must remember the respective constitutional duties of the legislature and the court. It is our duty to rule on the constitutionality of statutes. It is the legislature's duty to pass legislation in a constitutional manner. We would be overstepping our constitutional bounds if we attempted to provide or suggest

legislative solutions. The legislature is capable of solving the problem, and it is their duty to do so.

In passing I must comment on the majority's frequent attempts to cast doubt upon the standing of some classes of petitioners (although the standing of only one would have been sufficient). The accompanying rhetoric and conclusionary comments are not supported by a single case. To the contrary, the *dissent* has gone to considerable length to establish by fact and law, the standing of all classes of petitioners. I will not comment further.

Moving to another area of the majority opinion, I am appalled by the majority's assertion that the *legislature and superintendent of public instruction, not the courts*, are the determinants of *whether* and *in what manner the State's duty* to make ample provision for the education of the State's children *is to be discharged.* Without the slightest legal support the majority grants the legislature and superintendent of public instruction a carte blanche authority that places them above the law! If this is permitted, where will a citizen find his relief if it is felt that either the legislature or the Superintendent of Public Instruction is violating the constitutional duty? To suggest that the courts are somehow disabled in performing their historic function relegates us all to relying upon the fact that "Big Brother" or "Big Government" knows best. I cannot accept that ill-conceived idea.

At this point I must call attention to the majority's lengthy attempt to depreciate Const. art. 9, § 1 and its use of the phrase "It is the *paramount duty* of the state" (Italics mine.). The attack is two-pronged. First, an attempt is made to minimize the importance of the phrase by means of an interpretation that is irrelevant to the issues at hand. I shall not discuss this further because it has been fully covered in sections B, V, and VI of this dissent. The second attack begins with the comment "we have never placed so sweeping and overriding an interpretation on the phrase 'the paramount duty' as petitioners now urge." Thereafter,

the majority opinion cites five cases which have upheld the constitutionality of certain specific statutes related, directly or indirectly, to public school financing. The first case, *Pacific Mfg. Co. v. School Dist. 7*, 6 Wash. 121, 33 P. 68 (1893) is not concerned with Const. art. 9, § 1 at all. It discusses section 2. The second case cited is *State ex rel. DuPont-Fort Lewis School Dist. 7 v. Bruno*, 62 Wn.2d 790, 384 P.2d 608 (1963). This deals basically with the power of the State Board of Education to control school accreditation. Const. art. 9, § 1 is mentioned only by way of indicating that the power is derived from the State's constitutional obligation to provide an educational program as part of an integrated system of agencies created for that purpose. The third case, *Island County Comm. on Assessment Ratios v. Department of Revenue*, 81 Wn.2d 193, 500 P.2d 756 (1972) does not actually deal with Const. art. 9, § 1 at all. Rather, it is concerned with the right of school districts under section 2 to receive State funds appropriated by the legislature. Case number four is equally wide of the mark. *Carroll v. Bruno*, 81 Wn.2d 82, 499 P.2d 876 (1972) authorizes the State Superintendent of Public Instruction to consider federally generated forest funds as a part of funds distributed under the State's equalization scheme. Finally, *Newman v. Schlarb*, 184 Wash. 147, 50 P.2d 36 (1935) deals with whether the State can preempt local taxes for school purposes, holding that it can do so in the exercise of its paramount duty. In citing the foregoing cases the majority opinion reaches the conclusion that in none was it "suspected that the whole statutory structure for funding and disbursing school moneys was void for unconstitutionality . . ."

After reviewing the above-cited cases, I can only say that neither they nor the quoted conclusion are relevant to the issues before us. One cannot know what the court may or may not have "suspected" about the constitutionality of the public school financing structure. All we know is what the issues were and what the court said about them and in none of the cases cited was the instant issue involved. Not

one of the cases was required to pass on or even discuss the impact of the phrase "paramount duty of the state . . ." as it applies to the State's currently asserted duty. The majority well knows this court considers only issues before it. Thus, it is a complete nonsequitur to contend that the present system of public school financing must be constitutional merely because the constitutional issues here involved have not been discussed adversely in prior cases.

Finally, I must emphasize the fact that the majority has misapplied *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973) to the facts and law of the instant case. As pointed out later in Section B of this dissenting opinion, the constitution of Texas contains nothing similar to article 9 of the Washington Constitution. In fact, a review of the constitutions of all 50 states makes it abundantly clear that Const. art. 9, § 1 of our State constitution is unique. It is unnecessary to go into this further inasmuch as it is fully discussed in Section B, II through VI. At this point it is sufficient to say, however, that all *Rodriguez* held was that the Texas system did not violate the *federal* constitution. That is not the issue here. The issue before us is whether the *Washington* statutes violate Washington's own more restrictive *State constitution*.

As I stated earlier, this is probably one of the most difficult and far-reaching cases to confront this court in years. That, however, should not deter us from facing the facts as they *are* and the law as it *is* rather than viewing them in a way we would like them to be as a matter of expediency.

I turn now to Section B which is based entirely upon the actual findings of fact and applicable law.

### B
#### Legal Analysis Based Upon The
#### Findings Of Fact

The central issue before this court is whether the public school financing system of this state violates the equal pro-

tection clause of the Fourteenth Amendment, the privileges and immunities clause of Const. art. 1, § 12, as well as Const. art. 9, §§ 1 and 2, which declare the State's duty to make ample provision for the education of its children through a general and uniform system of public schools. I would hold that the public school financing system does not withstand constitutional challenge under either the privileges and immunities clause of Const. art. 1, § 12 or Const. art. 9, §§ 1 and 2.

The brief of the various petitioners, respondents and amici curiae have referred only generally to the State's public school financing "system", "plan" or "scheme" impacted by the federal and state constitutions. They have not, however, referred us to the specific statutes, allied provisions of the Washington Administrative Code (WAC), administrative rulings of the Superintendent of Public Instruction or of the State Department of Revenue which would be in need of revision. Suffice it to say the suggestion of this dissent on the constitutional issues involved would require revision of numerous statutes, associated portions of WAC, as well as administrative rulings in conflict herewith. Among those directly in conflict are chapter 28A.41 RCW and the allied administrative rulings of the Superintendent of Public Instruction. The aforenamed statutes, related WAC sections, and associated administrative rulings are only examples, and are neither inclusive nor exclusive in light of the constitutional issues involved herein.

One must be acquainted with the parties and the framework of the claims to properly understand the issues. The defendants-respondents (hereafter respondents) are the State Superintendent of Public Instruction, the State Director of the Department of Revenue, the State Treasurer and the members of the State Board of Education. The plaintiffs-petitioners (hereinafter petitioners) are children who attend public elementary and secondary schools located in specified school districts (each child being represented by a guardian ad litem), parents of the foregoing students, school directors of specified school districts who are also

parents of some of the foregoing students, and numerous school districts. Respondents have challenged the standing of petitioner school districts to maintain this action although the standing of the other petitioners is not put in issue.

Very generally, petitioners have alleged that the children herein attend public elementary and secondary schools located in specified school districts. The public school system is maintained throughout the state by a financing plan that relies heavily on local property taxes thereby causing substantial disparity, among individual school districts, in the amount of revenue available per pupil for the districts' educational programs. Thus, it is asserted, districts with a lower tax base are unable to spend as much money per child for education as are districts with a higher assessed valuation. This, it is said, violates the equal protection clause of the Fourteenth Amendment, the privileges and immunities clause of Const. art 1, § 12 as well as Const. art. 9, §§ 1 and 2. The assertions of petitioner-parents are substantially the same except, in addition, they allege that as a result of the financing plan they are required to pay a higher tax rate than taxpayers in many other school districts to obtain the same or lesser educational opportunities for their children. Petitioner-parent-school directors make similar assertions, but add that they are responsible for the operation of the districts in which petitioner-children are schooled. They contend educational opportunities they are able to provide are substantially inferior to those made available to children attending public schools in many other districts of the state. Finally, petitioner-districts add that respondents, in pursuing the present system of public school finance, have breached a duty to the districts who act on behalf of the other petitioners.

Petitioners pray: (1) for a writ of mandate directing respondents to reallocate the funds available for financial support of the school system and to restructure the financing scheme along constitutional grounds; (2) for a writ of

prohibition forbidding respondents from further allocation of such funds in violation of the state and federal constitutions; (3) for a declaration that the financing scheme is unconstitutional; and, (4) that this court retain jurisdiction affording respondents and the legislature a reasonable time in which to correct the alleged constitutional deficiencies.

Inasmuch as petitioners sought a writ of mandate and/or a writ of prohibition directed to respondent State Officers, the matter was filed directly in the Supreme Court pursuant to ROA I-58(a). The parties were unable to agree upon the applicable facts and the matter was referred to the Superior Court for Thurston County for a hearing, preparation of a statement of facts and findings of fact. ROA I-58(b).

I have reviewed the findings of fact prepared by the trial judge and find them supported by substantial evidence and painstakingly complete insofar as the relevant facts are concerned. Based thereon I begin my examination of the State public school financing system which is the focal point of the constitutional dispute.

I. THE FACTS PURSUANT TO TRIAL COURT'S FINDINGS OF FACT

The 320 school districts in the state of Washington are governmental units in the integrated system of agencies which form the public education system created by the legislature to carry out the constitutional mandate of Const. art. 9, § 2. School districts have distinct boundaries and the mechanism for establishing boundaries is set out in State statutes, thus restricting each unit to a finite amount of taxable wealth.

Pursuant to RCW 28A.41.130 and 28A.48.010, State monies are distributed annually to the school districts. The balance necessary for operation of the districts is generated by property tax levies at the local school district level with minor sums coming from county and federal sources. The relative contribution from each source is as follows:

| Source | 1960-61 | 1965-66 | 1970-71 |
|---|---|---|---|
| Local Property Taxes | 22.7% | 24.8% | 35.97%[8] |
| County Real Estate | | | |
| Excise Tax | 3.5 | 3.6 | 2.71 |
| Federal Funds | 5.0 | 7.5 | 6.4 |
| State Funds | 61.9 | 58.0 | 49.0 |

It will be noted that in the year 1970-71, 84.97 percent of public school funds were derived from two basic sources: (a) local school district taxes on real property, and (b) distribution of State funds to the local districts. These two major sources of local school revenue assume significance when it is considered that in the 10 years between 1960-61 and 1970-71 funds from State sources declined from 61.9 percent to 49.0 percent (*i.e.*, a drop of 12.9 percent) whereas funds generated within the local school districts by means of property taxes increased from 22.7 percent to 35.97 percent (*i.e.*, an increase of 13.27 percent). In short, as the State reduced its percentage of annual operational support, the local school districts were compelled to increase the percentage derived from local property taxes.

State operational support, called the "per pupil guarantee" is distributed to school districts to achieve a minimum guarantee of revenue for the "weighted student" enrollment of the district. This nonlevy support comes as the result of legislative appropriations based upon the budget request of the State Superintendent of Public Instruction. Currently, that guarantee is $365 per "weighted pupil." Pursuant to chapter 28A.41 RCW, the guarantee is determined generally as follows:

(a) First the State computes the basic enrollment of the district, kindergarten students count as one-half.

(b) Next, the State computes the total number of "weighted students" in an effort to take into account the cost of educating different types of students. For example, .3 is added for each secondary student; .2 is added for each

---

[8]This includes 2 mills shifted from local collection to State collection in 1968 which accounts for 4.59 percent of the revenues in 1970-71.

vocational pupil; .25 is added for students in interdistrict cooperation programs, etc. Other factors are also considered, for instance, additional funds are granted to districts with greater average staff experience, for the size of the district and whether the district is remote and necessary.

(c) The total "weighted" enrollment is multiplied by the $365 guarantee.

(d) Thereafter the State deducts 85 percent of the amount the school district would raise by levying an assumed or theoretical 14 mills against 25 percent of the true and fair value of the taxable real property within the district, and deducts the amounts raised from nonhigh school receipts, "in-lieu-of" tax receipts, real estate excise taxes, state forest taxes and a few other minor receipts.

(e) Finally, the total State contribution to the school district is the difference between (c) and (d) above.

In addition, the State reimburses school districts for 90 percent of their approved transportation costs. RCW 28A.41.160.

As previously indicated, the local real property tax is a major source of operating revenue.[9] Further, if voters in a school district desire to obtain revenue in addition to normally available operating and maintenance funds, they may do so by means of an "excess levy." Since revenue from excess levies is a product of the millage rate and the assessed value of the real property within the school district, it is at once apparent that the amount of taxable wealth or assessed valuation of the district will have an important effect on the capacity of the district to raise funds. Unfortunately, there is a substantial variation in assessed valuation per pupil among the State's school districts, ranging from a low of $1,925 per pupil to a high of $776,567 per pupil.

The State recognizes the existence of the foregoing wide variations and attempts some degree of equalizing by

[9]The property tax revenues are a product of the assessed value of real property in the district and the authorized millage rate for collection of taxes.

means of the above mentioned "per pupil guarantee" based upon the "weighted pupil" or "weighted enrollment." While the State has attempted to achieve some degree of equalization in school operation and maintenance revenue through the "per pupil guaranty," the method of its computation significantly benefits those school districts which have a high assessed valuation. Further, the amount of the "per pupil guaranty" has not kept pace with increasing operational and maintenance costs of the schools and does not provide sufficient funds to operate the public schools in the state. For example, the mean expenditure for all school districts is $819 and the mean expenditure for all pupils is $721, as compared with the State's "per pupil guaranty" of $365. Partial reimbursement of other expenses by the State has an additional nonequalizing effect. Some districts can more easily afford to incur the nonreimbursable portion of expense such as transportation, and hence can more easily qualify for larger amounts of reimbursement.

Beyond the State apportionment of funds, there is no equalization of school district finance. The low level of the State's apportionment has *forced* many school districts to rely increasingly upon special levy revenue. Further, the standards adopted by the State Superintendent of Public Instruction for receipt of State apportioned funds have additionally *compelled* reliance upon special levies. In fact, the amount of money raised by special levy millage in the State's school districts has increased sharply in the past 10 years from less than $10 million in 1957 to a high of $172 million in 1972. At the same time the percentage of State support of the public education system has steadily declined in the past 10 years. As previously indicated, in 1960-61 State funds comprised 61.9 percent of total funds (only 22.7 percent being locally generated) whereas in 1970-71 State funds had dropped to only 49 percent with a corresponding increase in local monies to 35.9 percent.

The problem facing numerous school districts becomes immediately apparent when it is realized that because of

variations in assessed valuation per pupil, the ability of school districts to raise a given per-pupil dollar by special levy is substantially different. For example, among the State's 320 school districts the range of per-pupil expenditure ranges from $4,517 per pupil to $470, the mean basic expenditure being $819 and the standard deviation between the basic expenditures per pupil being $392.

Reduced to its lowest common denominator, it is clear that the amount of money available to individual school districts is purely a function of the assessed valuation per pupil within the school district and the millage rate imposed (*i.e.*, the tax burden). School districts with low assessed valuation per pupil can match the spending level of districts with a high taxable base per pupil only by means of greater millage rates. To put it another way, in spite of the lower tax rate in districts with higher assessed valuation per pupil, their average expenditure per pupil is significantly greater than in the districts with lower assessed valuation per pupil. These variations not only occur among counties, but among school districts within counties.

Not only is there a relationship between per-pupil assessed valuation and per-pupil expenditures, but there is also a positive correlation between assessed valuation per pupil and median income (*i.e.*, the higher the assessed valuation per pupil, the higher the median income) in the eight counties in the state with the largest school population. Similarly, in the same counties (Yakima, Spokane, Pierce, Thurston, Clark, Kitsap, Snohomish and King) there is negative correlation between assessed valuation per pupil and the percentage of families with income below the poverty level (*i.e.*, the lower the county ranks in terms of assessed valuation per pupil, the higher the percentage of poverty families in the county). Parenthetically, it is of interest that respondents have assigned no error to the trial court's findings of fact that support the matters just related in this paragraph. Thus, they must be accepted as verities. ROA I-42(g) (iii); ROA I-43; *Martin v. Clinton*, 67 Wn.2d 608, 408 P.2d 895 (1965).

As can be seen, the current system of financing the State's system of public schools creates the major portion of·a vicious circle. Districts that have the lowest assessed valuations per pupil, and thus need additional operation and maintenance funds the most, must tax themselves at a higher rate than districts with a higher tax base per pupil. The final segment of the circle is closed when it is realized that a special levy, to produce a given amount of per-pupil dollars, has a better chance of passing within a district with higher assessed valuation per pupil, since the millage required in the district with higher assessed valuation per pupil will necessarily be less.

In the final analysis, there is a built-in discrimination contained in the per-pupil guarantee. For example, although in calculating the "per pupil guaranty," the State deducts 85 percent of the amount the school district would raise by levying an assumed or theoretical 14 mills against 25 percent of the true and fair value of the taxable real property within the district, the apparent 15 percent bonus (or "leeway") is not equalized and thus provides greater benefits to school districts with a higher assessed valuation per student. While each district will receive 15 percent, the dollar amounts per pupil will vary with differences in assessed valuation per pupil, inasmuch as the percentage figure is multiplied against the amount the respective districts produce by levying the basic millage—an amount which mathematically varies with the amount of assessed valuation in the districts.

Moreover, revenues from the 2-mill "state levy" are not equalized and thus provide greater benefits to districts with higher assessed value per pupil. The amount in dollars produced for a given district is the result of multiplying 2 mills times the assessed valuation of the district. Thus, school districts with higher assessed valuation per pupil will necessarily receive more per-pupil dollars from the 2-mill levy than will districts with a lower taxable base.

Still further, the weighting formula itself, which in-

creases the weighted enrollment figures to reflect staff training and experience, provides monetary benefits to districts which recruit and retain the more experienced and trained staff. Once again, districts which are better able to compete for experienced staff (*i.e.*, those with higher per-pupil assessed valuation) receive a double benefit: better staff and additional State money from the per-pupil guaranty.

The same double benefit is afforded the more affluent districts under reimbursements for transportation and other expenses. This, too, has a nonequalizing effect because some districts can more easily afford to incur the nonreimbursable portion of such expenses and hence can more easily qualify for greater reimbursement.

Beyond the discrimination found within the per-pupil guaranty, other inequities exist in the State's system of financing the public schools herein. Aside from the per-pupil guaranty, school district finances for all districts are nonequalized. The dollars available for schools are purely a function of the assessed valuation per pupil of the district and the tax burden or millage rate imposed. As previously indicated, the per-pupil guaranty has not kept pace with increasing school costs compelling reliance upon special levy revenue. Further, as the percentage of State monies for support of the public education system has decreased, reliance upon the unequalized special levy has increased sharply.

Still further, the increasing share of the burden that has come to rest on local school district property levies has had a substantial effect on district spending abilities, because over and above the State guaranty the major factor in determining the amount of money available to a school district for education is the district's assessed valuation per pupil. Wide variation in the assessed valuation of districts has caused a wide variance in the ability of districts to

raise funds by special levies.[10] Consequently, across the state, districts with high assessed valuation have found it necessary to tax themselves less than those with a low assessed valuation, to achieve the same basic expenditures per pupil.

The ultimate responsibility for this increased cost of education has fallen upon the individual taxpayer. Taxpayers' ability to secure a given per-pupil level of expenditures is limited to their willingness to accept the required millage rate, since they have no control over the other variable, assessed valuation per pupil. Thus, taxpayers in districts with low assessed valuation per pupil must accept a higher millage rate to reach a given level of per-pupil expenditure than do taxpayers in districts with higher assessed valuation per pupil.

When a special levy fails, the effect upon the school district and its students is dramatic because financing is a key to the provision of educational services. At such times, a district may be forced to cut personnel, cut salaries, eliminate classes, and cut materials and texts. Such a district loses its ability to compete with other districts for staff and to retain staff. It may even be necessary to close buildings, increase staff-student ratios, and to split school days to accommodate more students with less staff.

There are also direct effects if districts are required to depend upon special levies for operation and maintenance. There is speculation, uncertainty and hesitation to make long-range planning and funding.

In short, the current system almost compels educational opportunity to vary from district to district dependent

---

[10]For example, in 1971-72 in the metropolitan area of Seattle some of the levies and their products were:

| District | Special Levy Millage | Dollars Produced per Pupil |
|---|---|---|
| Seattle | 11.09 | 392.47 |
| Federal Way | 24.20 | 211.71 |
| Highline | 24.40 | 296.33 |
| Tacoma | 15.88 | 278.12 |
| Northshore | 28.7 | 358.92 |

upon difference in per-pupil assessed valuation. *Serrano v. Priest*, 5 Cal. 3d 584, 599-601, 96 Cal. Rptr. 601, 487 P.2d 1241 (1971), in discussing a similar problem confronting the California high court, had this to say:

> Obviously, the richer district is favored when it can provide the same educational quality for its children with less tax effort. Furthermore, as a statistical matter, the poorer districts are financially unable to raise their taxes high enough to match the educational offerings of wealthier districts. . . . Thus, affluent districts can have their cake and eat it too: they can provide a high quality education for their children while paying lower taxes. Poor districts, by contrast, have no cake at all.
>
> . . .
>
> . . . To allot more educational dollars to the children of one district than to those of another merely because of the fortuitous presence of such property is to make the quality of a child's education dependent upon the location of private commercial and industrial establishments. Surely, this is to rely on the most irrelevant of factors as the basis for educational financing.

(Footnotes omitted.)

Having outlined the basic framework of the State's public school financing plan, I now turn to petitioners' legal claims.

II. APPLICATION OF RODRIGUEZ BY PETITIONERS

First, petitioners allege that, within the sphere of the federal constitution, the foregoing financing scheme operates to the disadvantage of suspect classes and interferes with the exercise of fundamental rights and liberties. It is argued that the system violates the equal protection clause of the Fourteenth Amendment. I do not agree. This issue was resolved in *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973). The United States Supreme Court held therein that a similar plan of public school financing in the state of Texas was not a proper case for it to examine the state's laws under standards of strict judicial scrutiny. It pointed out that the test was reserved for cases involving laws that operate to the disadvantage of suspect classes or interfere with the

exercise of fundamental rights and liberties protected by the federal constitution. The court went on to determine in *Rodriguez* that the Texas school financing system did not operate to the peculiar disadvantage of any suspect class and did not impermissibly interfere with the exercise of a fundamental right or liberty protected by the federal constitution thus rejecting both of the predicates for invoking the compelling state interest standard of review and the close scrutiny approach which that concept purports to involve. In sum, the court held that the Texas school financing system did not violate the equal protection clause of the Fourteenth Amendment.

III. RESPONDENT'S APPLICATION OF RODRIGUEZ IS NOT IN POINT UNDER WASHINGTON STATE CONSTITUTION

Based upon the foregoing, respondents argue that *Rodriguez* is determinative of all issues before the court. They have, however, interpreted the impact of *Rodriguez* too broadly.

While the federal constitution, as interpreted by the United States Supreme Court, is controlling in its sphere, the question whether our *State* constitution has been offended is for us to decide. *Rodriguez* neither requires nor suggests a different view according to its later case history. Subsequent to *Rodriguez* the New Jersey Supreme Court was confronted with a legislative attempt to finance state elementary and secondary public education by means of heavy reliance on local taxation. Unlike *Rodriguez* in which a federal district court was reversed after holding the Texas school financing system violated the Fourteenth Amendment, the New Jersey Supreme Court held that state legislation contravened the New Jersey *state constitution.* In so doing, the New Jersey Court specifically acknowledged the holding in *Rodriguez,* as based on the federal constitution, but held that it was not deterred from deeming the state constitution more demanding. *Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273, 282 (1973), *modified on grounds not applicable here,* 63 N.J. 196, 306 A.2d 65

(1973). We are in the same position in our consideration of the Washington State Constitution. We are concerned with the constitutionality of *State* legislation based upon our interpretation of the *State* constitution. At this juncture it is of interest that the United States Supreme Court denied a petition for a writ of certiorari in the New Jersey case, *sub nom. Dickey v. Robinson*, 414 U.S. 976, 38 L. Ed. 2d 219, 94 S. Ct. 292 (1973).

While the legislation here involved may meet the general federal criteria found in *Rodriguez*, it does not necessarily meet the more strict standards imposed by our own State constitution. Thus, it is necessary to consider the State system of public school financing in light of the Washington State Constitution.

IV. "Compelling State Interest" And "Rational Basis" Doctrines Not Applicable

Respondents suggest that Const. art. 1, § 12[11] has the same impact as the equal protection clause of the Fourteenth Amendment and thus should be applied in the same manner, citing *DeFunis v. Odegaard*, 82 Wn.2d 11, 37, 507 P.2d 1169 (1973), *vacated and remanded on other grounds*, 416 U.S. 312, 40 L. Ed. 2d, 164, 94 S. Ct. 1704 (1974); *Sparkman & McLean Co. v. Govan Inv. Trust*, 78 Wn.2d 584, 478 P.2d 232 (1970) and similar holdings of this court. From this they reason that the public school financing system before us must be constitutional under Const. art. 1, § 12 because *Rodriguez* found that the similar Texas school financing system complied with the Fourteenth Amendment. I disagree with their conclusion.

In *Rodriguez*, at page 24, the state argued that "[b]y providing 12 years of free public-school education, and by assuring teachers, books, transportation, and operating funds, the Texas Legislature has endeavored to 'guarantee, for the welfare of the state as a whole, that all people shall

---

[11]Const. art. 1, § 12 provides in part:

"No law shall be passed granting to any citizen [or] class of citizens . . . privileges or immunities which upon the same terms shall not equally belong to all citizens . . ."

have at least an adequate program of education." The court pointed out that there was no proof offered which discredited or refuted the state's assertion. In the instant case, it is the uncontroverted finding of the trial court that the State's per-pupil guaranty *does not* even *provide sufficient funds* with which to operate and maintain the public schools. Thus, while neither the equal protection nor privileges and immunities clause requires absolute equality, our State constitution, article 9, sections 1 and 2, specifically requires the *State* to make *"ample* provision for the education of all children." (Italics mine.)

Respondents in *Rodriguez* also argued that the Texas financing system interfered with the exercise of a "fundamental right" and therefore a strict standard of judicial review was required. The court found that a "right" to education was neither explicitly nor implicitly guarantied by the federal constitution. Thus, the strict "compelling state interest" test was not applicable.

I also feel that neither the "compelling state interest" test nor the "rational basis" test is applicable herein. However, I would so hold for distinctly different reasons. As pointed out in Section VII of this dissent, a different question is presented. The issue is whether the State has met its "paramount *duty* . . . to make ample provision for the education of all children residing within its borders . . ." (Italics mine.) Const. art. 9, § 1.

V. Article 9, Sections 1 & 2 Are Unique, Explicit And Unlike The Texas Constitution

The Texas Constitution contains nothing similar to Const. art. 9, §§ 1 and 2 which read as follows: Section 1:

> It is the *paramount duty of the state* to make ample provision for the education of *all children* residing within its borders, without distinction or preference on account of race, color, *caste,* or sex.

(Italics mine.) Section 2:

> The legislature shall provide for a *general and uniform* system of public schools.

(Italics mine.) To this further extent the Washington Constitution, and thus this case, differ from *Rodriguez*. In fact, my research indicates that the introductory phrase of Const. art. 9, § 1 is unique among state constitutions.

The intent of the framers of our State constitution is evident. Const. art. 9, § 1 was part of the original constitution and has not been amended. Review of *The Journal of The Washington State Constitutional Convention 1889* (1962) reveals no indication that Const. art. 9, § 1 held or is to hold a secondary status or that it was or is to be construed in a manner other than by its plain language. Further, there is nothing to indicate that Const. art. 9, § 1 is other than declarative of the State's social, economic and educational duty. Quite to the contrary, a perusal of the constitution reveals the framers declared *only once* in the entire document that a specified State function was to be the State's *paramount duty*. That singular declaration of *paramount duty* is found in Const. art. 9, § 1.

While the passage of time often makes it difficult to ascertain the intent of constitutional provisions, there is no doubt the imperative wording of Const. art. 9, § 1 was intentional. Theodore L. Stiles, a member of the 1889 constitutional convention and later a justice of the first Supreme Court, wrote:

> No other state has placed the common school on so high a pedestal. One who carefully reads Article IX. might also wonder whether, after giving to the school fund all that is here required to be given, anything would be left for other purposes. But the convention was familiar with the history of school funds in the older states, and the attempt was made to avoid the possibility of repeating the tale of dissipation and utter loss.

T. Stiles, *The Constitution of the State and Its Effects Upon Public Interests*, 4 Wash. Historical Q. 281, 284 (1913).

In the same vein, it is of interest that general English usage is consistent with Justice Stiles' observation. The word "paramount" is not a mere synonym of "important."

As pointed out in B. Evans, *A Dictionary of Contemporary American Usage* 350 (1957):

> paramount is an adjective meaning above others in rank or authority, superior in power or jurisdiction . . . chief in importance, supreme, preeminent . . . When a thing is said to be paramount, it can only mean that it is more important than all other things concerned.

*Webster's Third New Int'l Dictionary* 1638 (1967) defines paramount in similar terms:

> 1: having a higher or the highest rank or authority . . . 2: superior to all others . . . CHIEF, SUPREME, PREEMINENT . . . syn see DOMINANT

Such singular use of the term "paramount duty" plus its common English usage, give clear indication of the importance attached to public education of this State's children.

By imposing upon the State a "paramount" constitutional "duty" to make ample provision for the education of all children within its borders, there has been created a "duty" that is preeminent or dominant. Flowing from the constitutionally imposed "duty," or legal obligation, is that "duty's" jural correlative, a "right"[12] (*i.e.*, control over another's conduct[13]). Thus, children residing within the borders of the state possess a "right" to have the State make ample provision for their education; that "right" being created by the constitutional imposition of a "duty" upon the State. Further, since the constitution has characterized the "duty" as *paramount*, the correlative "right" must be accorded equal stature.

Const. art. 9, § 1 not only imposes upon the State a *"paramount duty* . . . to make *ample* provision for the education of all children residing within its borders," but it requires that the goal be achieved "without distinction or

---

[12]W. Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 Yale L.J. 16, 30-36 (1913).

[13]W. Hohfeld, *Fundamental Legal Conceptions*, 65 (1964), *see also* the foreword by Arthur L. Corbin, at pages ix-xi, and introduction by Walter Wheeler Cook, at pages 5-11.

preference on account of race, color, *caste*,[14] or sex." (Italics mine.) In essence, the latter part of the section assures the school children of this state that the nature or quality of their education shall not be affected by their racial or cultural heritage, material wealth, or gender. Thus, it is readily apparent that Const. art. 9, § 1, in and of itself, provides public school children an independent guaranty of equal protection as to education in addition to whatever guaranties may be provided by article 1, section 12 of the State constitution.

From the foregoing analysis I can only conclude that the framers of our constitution meant what they said, that it is the *paramount duty* of the State to make ample provision for the public education of all children residing within its borders, without discrimination.

I do not disagree with the majority's observations concerning constitutional interpretation that: (1) "fundamental principles are of equal dignity and 'neither must be so enforced as to nullify or substantially impair the other'" (Citations omitted.); or (2) "'[N]o constitutional guaranty enjoys preference, so none should suffer subordination or deletion,'" (Citations omitted.); or (3) "'Every statement in a state constitution must be interpreted in the light of the entire document, and not sequestered from it, and none is to be considered alone.'" (Citations omitted.) I do say most emphatically, however, that the foregoing quotations and cases upon which they rely *are not in point in the instant case.*

The question here is not one of weighing fundamental principles of *equal* dignity or giving preference to one constitutional section over another abstract section of *equal* impact as a means of *interpreting* the document. In fact we are not here concerned with a matter of *interpretation* at all. Words in the constitution must be given their common

---

[14]Caste is defined as: " . . . 3a: a division or class of society comprised of persons within a separate and exclusive order *based . . . upon differences of wealth . . .*"(Italics mine.) *Webster's Third New International Dictionary* 348 (1971).

and ordinary meaning. *State ex rel. O'Connell v. PUD 1,* 79 Wn.2d 237, 240, 484 P.2d 393 (1971); *State ex rel. O'Connell v. Slavin,* 75 Wn.2d 554, 557, 452 P.2d 943 (1969); *State ex rel. Albright v. Spokane,* 64 Wn.2d 767, 770, 394 P.2d 231 (1964); *see also State ex rel. Graham v. Olympia,* 80 Wn.2d 672, 497 P.2d 924 (1972). As indicated previously the constitutional phrase "paramount duty," given its common and ordinary meaning is clear and unambiguous. Thus, any attempted interpretation of it other than in its normal and ordinary sense is clearly improper. *State ex rel. O'Connell v. PUD 1, supra; State ex rel. O'Connell v. Slavin, supra.* The real issue is whether the clear and unambiguous words of Const. art. 9, § 1 mean exactly what they say, particularly since the phrase "paramount duty" was used only once in the entire constitution. The issue is as simple as that. If the words do mean what they say, then we must follow them. *State ex rel. O'Connell v. PUD 1, supra; State ex rel. O'Connell v. Slavin, supra.*

If we do not like the direction in which they lead us under today's economic and social conditions, we should change them by constitutional means. But, we should not resort to the subterfuge of judicial "interpretation" to destroy their constitutional life. A resort to such tactics is not only unwarranted, it is dangerous.

VI. CONST. ART. 1, § 12 AND CONST. ART. 9, §§ 1 & 2
NOT SINGULARLY EXCLUSIVE BUT MUTUALLY SUPPORTIVE

It is suggested that article 1, section 12 of the State constitution[15] (*i.e.,* the privileges and immunities clause) and Const. art. 9, §§ 1 and 2 are singularly exclusive, each being applicable only on its own terms. Thus, it is urged, public school financing cannot be brought within the purview of the privileges and immunities clause of the State

[15]Const. art. 1, § 12:

"Special Privileges and Immunities Prohibited. No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

constitution by means of Const. art. 9, §§ 1 and 2. I do not agree with this concept.

First, as I pointed out in Section V above, in addition to those guaranties provided by Const. art. 1, § 12, Const. art. 9, § 1, in and of itself, provides public school children an independent guaranty of equal protection as to education.

Second, Const. art. 9, § 1 creates, constitutionally, a class of citizens to which the State owes the "paramount duty" of making "ample provision" for education (*i.e.*, "*all* children residing within its borders" (Italics mine.)). Article 9, section 1 also declares that such provision for education shall be "*without distinction or preference* on account of race, color, *caste*, or sex." (Italics ours.) Section 2 of article 9 provides further that the above-mentioned duty shall be carried out by means of a "*general and uniform* system of public schools." (Italics mine.)

Comparison of the foregoing with Const. art. 1, § 12 makes it abundantly clear that instead of being singularly exclusive, the two constitutional provisions are mutually supportive. Const. art. 9, § 1 constitutionally provides for a class of citizens (*i.e.*, "*all* children residing within its borders" (Italics mine.)). At the same time, Const. art. 1, § 12 declares that the State shall pass no law that grants any citizen privileges or immunities upon which the same terms shall not equally belong to all citizens. Considering the impact of both articles it is clear that within the class constitutionally created by Const. art. 9, § 1 there must be equality of treatment. If this court holds otherwise, the "paramount duty" so explicitly stated in Const. art. 9, § 1 and so positively emphasized by its singular use, would be relegated to a secondary position in the constitution. The same would be true of the constitutional mandate that the duty will be achieved by means of a "general and uniform system of public schools." Const. art. 9, § 2.

This is not to say that the State may not provide for proper subclassifications within the constitutionally declared class of "children residing within its borders." How-

ever, since Const. art. 9, § 1 has mandated it to be the "paramount duty" of the State to make "ample provision" for their education, the legislature should not be permitted to enact laws which derogate from the specifically declared duty owed the constitutionally created class.

## VII. THE STATE'S DUTY TO PROVIDE AN AMPLE EDUCATION AND STUDENT'S RIGHT TO RECEIVE IT

The petitioners have asked the court to apply the "compelling state interest" test to the legislation here involved, arguing that it will not survive the strict scrutiny required. On the other hand, the State has opted for the "rational relationship" test, contending the public school financing system is in fact rationally related to a legitimate State interest. I am convinced that neither test is applicable under Washington's constitutional mandate.

As indicated in Section V, all children residing within the state's borders have a "right" (in the true Hohfeldian sense) to be provided with an education. That "right" is constitutionally paramount. It is equally clear that the State's implementation of that "right" must be achieved by means of a "general and uniform system of public schools," Const. art. 9, § 2. Further, on a substantially equal basis, it must be "without distinction or preference on account of race, color, caste, or sex." Const. art. 9, § 1.

Since the children residing within the state's borders possess such a "right" (with the State having a correlative "duty" to provide for the implementation of that "right") the State may not escape its constitutional "duty" even by showing that it has a "compelling state interest" for so doing or that there is a "rational relationship" between the legislation enacted and the end sought to be accomplished. The State may discharge its "duty" only by the performance thereof or by the prevention of that performance by the holder of the "right."[16] Thus, in the instant case, neither

---

[16]Although a "right" is an *absolute*, imprecise reasoning has caused courts regularly to recognize different degrees or grades of "rights" from which flow different jural results. For example: (a) some "rights" are deemed absolute; (b) others may be impaired but only upon

the "compelling state interest" test nor the "rational relationship" test opted for by the respective parties are appli-

showing of a "compelling state interest"; whereas, (c) a third group may be invaded with the existence of a mere "reasonable relationship" between legislation and the end sought to be accomplished. If, in fact, "rights" are *absolute* then clearly those so-called "rights" that are subject to invasion or impairment by either the "compelling state interest" or the "reasonable relationship" test are not true "rights." They must have some other definition that gives rise to their different jural significance and thus justifies the dissimilar treatment.

This explanation of the difference in definition and consequent jural significance that supports current results is neither intended to limit the "privileges and immunities" protected by the federal and state constitutions nor to denigrate what the courts have referred to as "rights" therein. In fact, the drafters of the federal and state constitutions probably made no clear distinction in thought or their choice of words, in the Hohfeldian sense. Nevertheless, our reference to this precise method of legal thinking and terminology helps us to better understand what the courts have been attempting to say about the federal and state constitutions, and, as Arthur L. Corbin indicated in his foreword to W. Hohfeld, *Fundamental Legal Conceptions* at xiv (1964), it also helps make it clear what the drafters of the constitutions intended.

Close observation of the federal and state constitutions, as well as the wealth of cases dealing with them, reveals that true "rights" exist either by reason of a positive grant in the constitution, or because it has been so interpreted. These "rights" are absolute and cannot be invaded or impaired. They give rise in others (in this case the State) to correlative "duties." On the other hand, certain other legal entitlements exist which, although denominated "fundamental rights" by the courts, are not "rights" in the sense that they are absolutes. They exist because the constitutions have, in negative terms, provided for noninterference with specific legal entities. For example: "Congress shall make no law respecting an establishment of religion . . . or abridging the freedom of speech or of the press . . ." U.S. Const. amend. 1.

The foregoing jural entities, while denominated by the courts as "fundamental rights," are not treated as absolutes because they have held that these so-called "fundamental rights" may be invaded or interfered with if there exists a "compelling state interest." Although having a somewhat lesser status than true "rights" (an absolute), the courts have also recognized them as extremely important and will tolerate societal interference only for reasons that are "compelling." In short, society has no right to legislatively infringe upon one's constitutional entitlement to noninterference except for "compelling" State reasons. Since it does not involve a true "right," however, it should be denominated as a "fundamental *freedom*," a "fundamental *liberty*" or a "fundamental *privilege*" (the italicized words being legally synonymous —see W. Hohfeld, *Fundamental Legal Conceptions* 47 (1964) and the

cable. Since there is no evidence that any of the petitioners have prevented performance of the State's duty, the sole question is whether the State performed its mandated duty. Based upon the findings of fact, I would hold that the State has not met the constitutional duty imposed by Const. art. 9, §§ 1 and 2 either singly or as supported by Const. art. 1, § 12.

## VIII. AMPLE EDUCATION

Respondents argue that guidelines for what is an "ample" education must necessarily differ according to the variable costs of the 320 districts and the multitudinous need of the State's school children. It is posited that while children in some school districts have less spent on their education than do those in other districts, expenditures per pupil are not an adequate criteria for measuring the quality of public school education. Further, it is argued that the public school system, in fact, provides an "ample" education for all children in the state.

Possibly it is true that there may be no exact standard for measuring the quality of education children receive in a given school district. Nevertheless, it is crystal clear that there exist vast discrepancies in dollar input per pupil, a fact that in the final analysis is very relevant in light of the

---

discussion of "privilege" and its synonyms legal "freedom" and legal "liberty").

In actuality, then, we do not have a single class of "rights" with a confusing plethora of protections ranging from an "absolute" on the one hand to the State's power of infringement, on the other, if there is a mere reasonable relationship between legislative regulation and the end sought. Rather we have "rights" as absolutes and we have legal "freedoms," legal "liberties" or legal "privileges" (as synonyms) which, although of a lesser stature than "fundamental rights," are still so basically important that they may not be invaded unless there is a "compelling state interest."

As stated in the body of the opinion, in the instant case the mandate of Const. art. 9, §§ 1 and 2 is concerned with a true "right" (an absolute). Thus, the State's only answer is either compliance or a showing that its attempt to comply was met with interference by those claiming the "right." We are not therefore, concerned herein with either the "compelling state interest" test or the lesser "rational relationship" test.

further fact that financing is a key ingredient in the provision of educational services for children.

Most assuredly, it cannot be said that the constitutional mandate for an "ample" education has been met by the State unless the majority is prepared to adopt the strained position that the lowest level of basic per-pupil State guaranty (in dollars) provided to a given district coincides with the requirement and that all efforts beyond that lowest level are attributable to local decisions to furnish more than the State has a duty to provide.

Logic requires me to reject this concept. It does not comport with the trial court's findings of fact which reflect that the State apportionment not only has failed to keep pace with increasing school costs but that the per-pupil guaranty does not even provide sufficient funds with which to *operate* the public schools. Rather, the low level of State support has *compelled* many districts to rely upon special levy revenue merely to provide operation and maintenance funds.

In terms of quality, respondents assume that there is no conclusive, static or exact definition. This does not mean, however, that the State's duty to make "ample" provision for education is thereby beyond scrutiny. There are ongoing factors as well as financial, current and historical considerations that have an impact upon the subject and are a commonsense aid in determining what may or may not be "ample."

For example: the term "ample provision for education" appeared in the original draft of our State constitution and has remained without change. Nevertheless, one would hardly be heard to argue that the State's mandated duty to provide an "ample" education has been met merely because the State's "per weighted pupil guaranty" gives rise to more acceptable facilities than were provided at the time Const. art. 9, §§ 1 and 2 were originally adopted. Times change. What may have been "ample" in 1889 may be, and probably is, wholly unsuited for today's children con-

fronted, as they are, with contemporary demands and new complexities of life unknown to the drafters of the State constitution.

It must be made clear, however, that by recognizing changing times and the needs of a dynamic society, one does not thereby *change* the constitution. Quite the contrary. If we fail to *interpret* the constitution in accord with the demands of a modern society, the constitution stands in danger of becoming atrophied and, in fact, will lose its original meaning. It is the duty of our courts, as guardians of the constitution, to ensure that our State constitution shall not become, in the words of Chief Justice Marshall, "a magnificent structure, indeed, to look at, but totally unfit for use." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 222, 6 L. Ed. 23 (1824). He further noted that a constitution is "intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415, 4 L. Ed. 579 (1819).

In all candor, then, the State's constitutional mandate must be understood to embrace the educational opportunity that is needed, in the contemporary setting, to equip the children of this state for their role as citizens and as potential competitors in the labor market and the marketplace of ideas. *Robinson v. Cahill*, 62 N.J. 473, 515, 303 A.2d 273 (1973); *see also Keyishian v. Board of Regents*, 385 U.S. 589, 603, 17 L. Ed. 2d 629, 87 S. Ct. 675 (1967). In other words, education has a critical role in a free society. It must prepare children to participate effectively and intelligently in our open political system if the system is to survive. *See Wisconsin v. Yoder*, 406 U.S. 205, 221, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972). It must prepare them to exercise their First Amendment "freedoms" ("liberties" or "privileges") both as sources and receivers of information; and, it must prepare them to be able to inquire, to study, to evaluate and to gain maturity and understanding. The constitutional "right" to have the State "make ample provision for . . . education" will be hollow indeed, however, if

the possessor of that "right" is unable to compete adequately in our open political system, in the labor market or in the marketplace of ideas.

With the foregoing thoughts in mind it can hardly be said that children who reside within school districts having an inadequate tax base to support even operating and maintenance budgets have had ample provision made for their education. Poorer districts are *compelled* to rely on special levies for the bare necessities of operating and maintenance. If their levies fail, as many have, those school districts are forced to close schools, discharge teachers, increase teacher-student ratios, eliminate classes, reduce hours of instruction, cut material and texts, and even forego adequate planning for future betterment of the district's school system. It cannot be said that such a system of financing education in public schools makes "ample provision for . . . education" by means of a "general and uniform" system of public schools. Too many children residing within the state are left on the outside looking in.

The high courts of California and New Jersey have each declared the system of public school financing, in their state, unconstitutional. *Serrano v. Priest*, 5 Cal. 3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241 (1971); *Robinson v. Cahill, supra.* The problems there involved were not entirely dissimilar to those before us. These cases are of considerable interest, however, because the constitution in neither state imposes the unique explicit "duty" found in Const. art. 9, § 1 and neither requires a "general and uniform system of public schools." Without question, the petitioners herein stand on much firmer constitutional ground than do their counterparts in either California or New Jersey.

IX. "RELATIVE WEALTH" THEORY NOT APPLICABLE TO OTHER MUNICIPAL CORPORATIONS

Respondents suggest that if the relative wealth of school districts may not be used as a major factor in determining the quality of public education, this court must be deemed to have directed the same command to all municipal corpo-

rations in respect to tax-supported public services. This argument is without merit. Although I do not at this time express my views on other governmental services, I am satisfied that I have explained the unique position of public education in the constitutional scheme. Only with the system of public schools has the constitution mandated that the State has a paramount duty.

X. STANDING OF PETITIONERS

Next, respondents assert that petitioner school districts have no standing to bring the instant action. Respondents do not, however, challenge the standing of the petitioner children, their guardians ad litem, the several individual school directors or those who also assert one of those capacities and are also taxpayers.

Basically, respondents argue that petitioner school districts: (a) Do not state a claim for which relief can be granted, because municipal corporations are not entitled to the protections afforded by (1) the fourteenth amendment to the United States Constitution; (2) Const. art. 1, § 12; or (3) Const. art. 9, §§ 1 and 2; (b) A school district, as a municipal corporation, may sue and be sued, pursuant to RCW 28A.58.010, to protect the rights of the district but there is no statutory provision authorizing it to sue on behalf of its children or the taxpayers of the district who are the only real parties in interest; (c) A municipality does not have standing to question the constitutionality of a statute unless it alleges that the questioned statute violates a constitutional provision designed to protect municipal corporations.

I agree with petitioner districts' lack of standing to challenge the State system of public school financing under the Fourteenth Amendment and Const. art. 1, § 12. *Moses Lake School Dist. 161 v. Big Bend Community College*, 81 Wn.2d 551, 503 P.2d 86 (1972). There is, however, a different issue involved in the districts' challenge to the State's public school financing system under RCW 28A.58.010 and Const. art. 9, §§ 1 and 2.

Without question, in the past, consideration of standing has been subject to rigid legalistic rules requiring an infringement of a specific legal right or interest. This has, however, been eroded over the years permitting a broader view of factual interests that will give rise to standing. *Association of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 25 L. Ed. 2d 184, 90 S. Ct. 827 (1970); *Barlow v. Collins,* 397 U.S. 159, 25 L. Ed. 2d 192, 90 S. Ct. 832 (1970); *see also* Davis, *Administrative Law Treatise* 710 (1970 Supp.). Not only has the United States Supreme Court seemingly abandoned strict reliance upon the over legalistic "interest-right" test of standing, it made the following comment in so doing, in *Data Processing* at page 153:

> The "legal interest" test goes to the merits. The question of standing is different. It concerns, apart from the "case" or "controversy" test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

A review of our own more recent cases indicates that we too have shifted from the strict legalistic view to one which more correctly recognizes that standing may occur if there is *injury in fact.* For example in *Moses Lake School Dist. 161 v. Big Bend Community College, supra,* we actually reviewed the merits of a dispute and concluded that the plaintiff school district had no rights against the State. There was, however, no hint that the school district lacked standing to raise constitutional issues and thus should have suffered the result without a hearing on the merits. Similarly in *Snohomish County Bd. of Equalization v. Department of Revenue,* 80 Wn.2d 262, 493 P.2d 1012 (1972), we went to the merits of a constitutional claim at the instance of a county board, expressly holding, at page 265, that the county had standing.[17]

---

[17]Although not directly in point, the extent to which this court has gone in liberalizing "standing" of interested persons or parties is also

Based on more recent liberalized views of standing, and turning to the instant case, the petitioner school districts clearly have standing to challenge the constitutionality of that legislation which creates the State's system of public school financing. The districts' interests are not theoretical, they are concerned with a real judicial controversy imposed upon them because they stand at the very vortex of the questioned system. In short, the interests sought to be protected by the districts are arguably within the zone of interests to be protected or regulated by the statute or the constitutional provision in question.

It is clear that the basic reason for the existence of school districts is the education of children through the development and maintenance of schools and educational programs associated therewith. Within that framework the district is authorized to sue and be sued. RCW 28A.58.010 provides:

> A school district shall constitute a body corporate and shall possess all the usual powers of a public corporation, and in that name and style *may sue and be sued and transact all business necessary for maintaining school and protecting the rights of the district,* and enter into such obligations as are authorized therefor by law.

(Italics mine.)

In considering the question of standing, then, what could be more fundamental to the maintenance of schools, and the educational program, than an action the result of which is to provide sufficient revenue to keep schools open and basic programs intact in a manner required by the State constitution?

What could be more fundamental than the districts' need for review of a legislatively created system of public school financing that undermines the very means of their existence?

What greater interest could there be in the outcome of this litigation than that possessed by the petitioner school districts? The current legislatively created system of public

illustrated by our decision in *Loveless v. Yantis*, 82 Wn.2d 754, 513 P.2d 1023 (1973).

school financing compels them to rely upon special levies for the bare necessities required to keep schools open, maintain teaching staffs, and provide educational materials. Yet, upon failure of a special levy (which has been rather frequent of late) districts are often forced to consider and implement school closures and educational cutbacks which result in reduction of the teaching staff. This latter fact alone has culminated in school districts being sued by teachers separated from their positions. For example, *see Thayer v. Anacortes School Dist.,* 81 Wn.2d 709, 504 P.2d 1130 (1972); *Boyle v. Renton School Dist. 403,* 10 Wn. App. 523, 518 P.2d 221 (1974). When school districts are forced into positions of potential litigation, as parties defendant, how can it be said that they lack interest or standing to challenge the constitutionality of the very system that forces them into that potential litigation? I would hold that the petitioner school districts have standing to maintain the instant action.

XI. ISSUES NOT BEFORE THE COURT

I have heretofore suggested how I believe this court should hold on specific issues. Because of the nature of the case, however, it is necessary to clarify some of the areas in which I have not suggested that we should act. The following list is neither inclusive nor exclusive, it is explanatory only.

1. I believe strongly that the present legislatively and administratively created State system of financing public school education is unconstitutional. Nothing will be gained by further explanation of the subject. In my analysis of the constitutional problem I called attention to, and criticized the current State system that has *compelled* petitioner districts to rely upon special levies to keep schools open, retain adequate professional teaching personnel, and even provide teaching materials. However, in this case it is and would be unnecessary to pass upon whether local special levies, as such, are unconstitutional or whether special levies adopted strictly *at the option* of local school districts,

for the purpose of educational enrichment, are unconstitutional.

2. Our State constitution requires that the legislature "provide for a general and uniform system of public schools." Const. art. 9, § 2. It is and would be unnecessary to pass upon whether there may be a variance in State authorized spending in school districts for the purpose of encouraging temporary experimental programs or to meet temporary exigencies.

3. I have discussed at length the State's constitutional duty to "make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." Const. art. 9, § 1. At this time, however, we would not, in my proposed opinion, be required to decide whether the system eventually to be adopted by the legislature must meet any *particular* level of spending beyond that heretofore held not to be ample.

4. In my discussion of the unconstitutionality of the State's public education financing system, I commented critically upon the manner in which use of the local tax base of various districts created a financial imbalance. I have not suggested, however, that property taxes imposed by either the State or local districts are unconstitutional. In the same vein, I do not suggest the imposition of another type of tax. The choice, as well as the wisdom of that choice, is a legislative matter.

5. Although I would hold unconstitutional the current State system of public school financing, the status of this case does not call upon the court to pass upon whether local districts may or should set their own levels of spending, whether that is a State matter, or whether it should be divided. Again, this is a legislative matter.

6. Further, I find that the status of this case does not call upon us to resolve the merits or demerits of local versus State control of other school or educational matters. In connection with the entire picture, this is strictly a legislative matter.

7. Finally, it should be pointed out that I have not suggested an attempt to limit, or even suggested the alternative types of public school financing that are constitutionally available to the legislature. The legislature should, in my opinion, be provided with an adequate opportunity to give the entire problem thorough study. The choice of system and manner of providing for a constitutionally proper system of financing public schools is for the legislature.

XII. THE TIME ALLOTMENT FOR SUITABLE REMEDY

It is not enough merely to suggest that the present system is unconstitutional. One must also consider the available remedies. First, the relief should be prospective so that obligations incurred would not be impaired. Second, it is recognized that some period of time will be needed to establish another statutory system. In the meantime, operation of the State public educational system must continue. Thus, I would hold that obligations hereafter incurred pursuant to existing statutes should be valid in accordance with the terms of those statutes. However, I would require the legislature to enact legislation compatible with my dissent effective no later than July 1, 1977. There is nothing new in this procedure. Our own court used this plan in giving the State and counties necessary leeway to retool their procedures following our decision in *Carkonen v. Williams,* 76 Wn.2d 617, 458 P.2d 280 (1969). A similar result is found in *Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273 (1973), *cert. denied, sub nom. Dickey v. Robinson,* 414 U.S. 976; *see also Brown v. Board of Educ.,* 349 U.S. 294, 99 L. Ed. 1083, 75 S. Ct. 753 (1955).

FINLEY and UTTER, JJ., concur with STAFFORD, J.

UTTER, J. (concurring in the dissent)—While I join in the dissent, I do so for slightly different reasons from those emphasized in Justice Stafford's extensive and thoughtful dissenting opinion. I, too, would rely on the provisions of our State constitution, which go far beyond the federal constitution in establishing education as a primary responsibility of the State and right of its citizens.

Sections 1 and 2 of article 9 of our constitution require the State, through its legislature, to make provision for an ample system of education. These sections impose a duty on the State government to directly finance at least the basic operation and maintenance budget of the schools. The present system improperly forces the school districts to rely on local funding. It therefore allows local political and social considerations, such as those reflected in decisions on special levies, to interfere with the basic State guaranty of education. As such it violates the constitutional requirement that the State *itself* make ample provision for the school system. This is not to say that special levies cannot be used, but only that it is impermissible that they be relied upon to meet the minimum needs of the schools.

As I read the concurring opinion of Justice Rosellini, I perceive only one pivotal difference in the outcome of our approach to this case. This is the question of whether or not the record here establishes the fact that the State is not adequately funding the basic operation and maintenance of the schools without dependence on special levies. If the record in a given case supported the trial court's determination that this was not being done, it would seem to me Justice Rosellini would also find a violation of the constitutional requirement that the legislature make provision for an ample system of education. I believe the record before us is sufficient. It shows that, however adequate or inadequate, uniform or nonuniform the financing of the schools presently is, it is now in large part out of the hands of the State. Such a situation cannot be reconciled with the strong policy and absolute language of our constitution.

Petition for rehearing denied March 20, 1975.